17763

Ernest MUNGO, Respondent, v. Carl E. BENNETT, Appellant

(119 S. E. (2d) 522)

*Messrs. Joseph L. Nettles,* of Columbia, and *Frank E. Rector,* of Camden, *for Appellant,*

*Messrs. Murchison, West & Marshall,* of Camden, *for Respondent,*

April 7, 1961.

STEVE C. GRIFFITH, Acting Justice.

This is an action for damages for personal injuries suffered by the plaintiff when kicked by a stallion belonging to the defendant. In a trial by jury the plaintiff was awarded actual damages in the amount of $7,500.00. The defendant appealed.

The complaint charged the appellant with negligence in (1) keeping a horse of known vicious nature, (2) in failing to warn respondent of its vicious nature, and (3) in failing to keep the horse under control.

Appellant excepts to the Trial Judge's refusal to direct a verdict, or to order judgment notwithstanding the verdict, on the grounds that (1) no negligence was proven, and (2) respondent was guilty of contributory negligence as a matter of law.

We have no case in this State dealing with the liability of the owner of a horse for injuries inflicted by the animal upon third persons. The authorities generally agree that all domestic animals, whether horses, mules, cattle, dogs, cats or others, are not presumed to be dangerous to persons, and before recovery of damages may be had against the owner the injured party must prove that the particular animal was of a dangerous, or vicious, nature and that this dangerous propensity was either known, or should have been known to the owner. The negligence that imposes liability upon the owner is the keeping of a dangerous animal with knowledge of its dangerous tendency, or in the failure to restrain it from injuring persons. 2 Am. Jur., page 728 *et seq.;* 3 C. J. S., Animals, § 145 *et seq.,* p. 1247 *et seq.;* note in 6 L. R. A., N. S., 1164; 3 C. J., page 89 *et seq.* and cases cited from various jurisdictions, particularly p. 90.

And, a vicious disposition "* * * is a propensity or tendency of an animal to do any act that might endanger the safety of the persons and property of

others in a given situation. Although an animal is actuated solely by mischievousness or playfulness, rather than maliciousness or ferociousness, yet, if it has a tendency to do a dangerous or harmful act, it has a vicious propensity within the meaning of the rule holding the owner or keeper liable for injuries resulting from vicious propensities of which he has knowledge." 3 C. J. S., Animals, § 148, pp. 1250-1251.

As to injuries by dogs, our Court applied these general principles in our early case of *M'Caskil v. Elliot,* 5 Strob. 196. This case exploded the popular notion that "a dog is entitled to one bite." It laid down what is now the well established general rule that if an owner has heard or seen enough "to put the owner on his guard and require him, as an ordinarily prudent man, to anticipate the injury that has occurred" (2 Am. Jur. 729), he has knowledge of the vicious or dangerous disposition. We quote therefrom:

"That a dog has once bitten a man, is a circumstance from which the probability of its biting another, may be inferred; but the same inference may be drawn with equal confidence from other indications of the dog's disposition. Indeed, attempts before made by a dog that had never succeeded in actually biting, may give more full assurance of danger to be apprehended from it, than could exist as to another dog, that under some peculiar circumstances had used its teeth upon man. To require that a plaintiff, before he can have redress for being bitten, should show that some other sufferer had previously endured harm from the same dog, would be always to leave the first wrong unredressed, and to lose sight of the thing to be proved in attention to one of the means of proof."

The foregoing in brief is the applicable law. And it is interesting to observe that the liability thus imposed by these general principles upon owners of domestic animals instead of being relaxed, have been changed in some states by stat-

ute, "* * * so that the owner of a dog or other domestic animal may be liable for injuries inflicted by it, even though he did not know of its vicious or mischievous propensities." 2 Am. Jur., Page 733.

Turning now to the evidence and considering it in the light most favorable to the plaintiff, we find that the respondent, a Negro, is a neighbor of the appellant, a white man. On the day of the injury in response to a call from appellant the respondent went to the back yard of appellant to see him and found him currying his horse. When he approached, appellant was holding the bridle with one hand and currying with the other. Respondent did not know anything about the horse and had never seen it before. While respondent was talking to appellant, standing about five feet from the right front shoulder of the horse, it suddenly whirled around and kicked the respondent, as the appellant belatedly hollered to respondent, "Look out, Jay." Immediately following the kicking, the horse jumped his lot fence and ran away. Appellant went to respondent and thought him to be dead. A few days after the accident, and while the respondent was in the hospital, appellant visited respondent and told him "that he was sorry that the accident happened, and that he was sorry that he failed to warn me about the horse being dangerous * * * and that he didn't tell me the horse would kick me."

While it is not important in reviewing the refusal to direct a verdict that there should be a lack of conflict in the evidence, for this Court is bound to accept the testimony of the plaintiff as true, yet the evidence is largely free from conflict. Appellant admitted that he called the respondent over to where the injury occurred; that he was holding the horse and currying it and saw him when he walked up and "should have told him that it wasn't no 'playboy' ". He was familiar with the horse and had owned him approximately two months. He didn't trust the horse enough to curry him without a halter or bridle and he "did-

n't get around and get off where his hind legs are". He admitted that the horse had to turn to kick the respondent, stating:

"A. Well, he did kind of make a 'flounge' sideways.

"Q. So, when you said a minute ago that you weren't going to walk behind his heels, you didn't mean to infer to the jury that Ernest walked behind the horse and right in the direct path of his heels, did you? A. No. When he made that 'flounge' sideways, of course, he kind of went to the side."

He also admitted that he told respondent that he was sorry that it happened, and was sorry that he didn't warn him.

There was no showing that the horse had previously kicked anybody.

From the foregoing evidence, it is reasonable to draw the conclusions that the horse was dangerous or vicious, as those terms are used in the applicable law, and that the appellant was aware of it. Furthermore, it is reasonable to draw the conclusion that the appellant was negligent in calling the respondent to the place of danger without any warning.

The appellant also contends that a directed verdict should have been granted upon the ground that the only reasonable conclusion to be drawn from the evidence is that the respondent was contributorily negligent. Under our decisions the affirmative defense of contributory negligence rarely becomes a question of law for the Court. *Gillespie v. Ford,* 225 S. C. 104, 81 S. E. (2d) 44. The authorities relied upon by appellant are three cases from other jurisdictions, all of which the Trial Judge held were not persuasive in this case, and we agree.

In one of the cases, *Heath v. Fruzia,* 50 Cal. App. (2d) 598, 123 P. (2d) 560, the Court held as the Trial Judge here, that the question of contributory negligence of the

plaintiff was for the determination of the jury. In the other cases relied upon by appellant, *Miller v. Atlantic Refining Co.,* 210 Pa. 628, 60 A. 306, and *Tolin v. Terrell,* 133 Ky. 210, 117 S. W. 290, 291, the Court stated in each case that the plaintiff was guilty of contributory negligence in that he had deliberately walked directly behind the heels of the animal, and was there at the time of getting kicked.

The *Tolin case* uses the strongest language of the cited cases, and shows in the statement of facts that the person injured by being kicked by the mule was working it at the time of getting kicked. The action was not against the owner of the mule, but against the owner of a horse which had reached about three feet over a fence, shoulder high, and bit the mule on the rump, causing the mule to kick. This vicious act of the horse was the basis of the action. The Court held that the plaintiff failed "to show that the negligence of defendant was the proximate cause of plaintiff's injuries", and in course of the opinion said: "In spite of the fact that there was testimony to show that this mule was of so gentle a disposition the children could play at his heels, it is a matter of common knowledge and common experience that there is no telling when or under what circumstances a mule will or will not kick. The only way to escape danger from the feet of a mule is not to go within the radius of his heels."

We doubt that this is a correct statement of common knowledge and experience. It is our observation and experience that a horse or mule, if properly trained, does not kick. We do know as a matter of common knowledge that it is impossible to work such an animal without going "within the radius of his heels", and being exposed many times daily to the danger of being kicked. For example, in harnessing the animal the crupper and breeching must be fitted under the animal's tail, and this requires not only standing at the animal's heels but annoying it as well by handling its tail. Again every time the animal is hitched or unhitched it is necessary to take hold of each trace and

fasten it to the singletree at the animal's heels. And when the hitching is to a plow, and many other farm implements, the singletree is very near the ground and requires the worker to take a completely helpless position as he stoops over and places his head near the animal's heels and hitches or unhitches the trace chains. Similarly, the hitching of a team to a wagon, or other vehicle, requires the worker to squeeze between the singletree and heels of the animal to hitch the inside traces.

Such exposures to being kicked in working an animal are many and often. And, yet, in this State boys on the farm, white and colored, in past years before machinery replaced horses and mules, worked those animals with the entire confidence of their parents.

When this writer was a boy on the farm the older colored farm workers had a common expression to give their view of the difference between the well trained animal and one that would kick, and the impossibility of working the latter, by saying that "A kicking horse or mule will kick molasses out of a ginger cake."

Of course, just as in the cited case, it is probable that most any horse or mule may be made to kick, just as most dogs can be made to bite, and most people, for that matter, made to fight.

Furthermore, the doctrine of those cases, if applied here, is illogical. As heretofore pointed out, the authorities generally agree that there is no presumption that a domestic animal is dangerous to man. It must be proven. Also, knowledge must be proven. Now, the Court, in each of the two cases relied upon by appellant, without repudiating those generally accepted principles, when it reached the affirmative defense of contributory negligence took judicial notice of the fact that the animal was dangerous, and charged the plaintiff with knowledge thereof, as a matter of law: the identical facts that a plaintiff is required to prove to make out his case.

A study of the *Miller case* shows that is exactly what the Court did. In that case the person who was kicked, (and who died as a result thereof), passed near the rear of the horse, which was standing on a sidewalk. The Court found that there was [210 Pa. 628, 60 A. 307] "* * * no permanent or unreasonable obstruction of the sidewalk in the temporary stoppage of the horse at that point." And, further found, "There was no testimony to show that the horse was vicious, or that it had been known to kick before." Then, after having exonerated the defendant of all charges of negligence, the Court, in considering the defense of contributory negligence, said: "But, even if there was any question as to this, we are unable to regard the action of William Miller in walking deliberately past the heels of the horse, and within reach of them, without giving any warning or speaking to the horse, as being anything other than negligence which contributed to the happening of the accident. * * *"

In addition to the authorities hereinbefore cited, there is a note in 26 A. L. R. 871 discussing the duty of a master to warn his servant of the viciousness of a horse or mule used in the master's work, which, though not controlling, is helpful in understanding the trend of the decisions of the Courts on the subject here. Of course, a master would not be required to warn his servant of matters that are of common knowledge. However, an examination of the review of the cases covered in this note will show that all of the courts hold that the law imposes upon the master the duty of warning a servant of the known dangerous propensities of horses and mules, which are not actually known to the servant; and this is true even though the servant be experienced in handling such animals. In the case reported therewith, *Boatman v. Miles,* 27 Wyo. 481, 199 P. 933, 935, holding a master liable for injuries to a servant in being bitten by a stallion furnished the servant in his work, expressed a sounder view of common knowledge and experience. Quoting briefly therefrom: "It is not likely that the temper of the

animal changed overnight. The jury had a right to consider common experience. The stability of characteristics, inborn or acquired, is well known, and manifested alike in the vegetable and animal world. The traits exhibited by us in childhood are often still noticed when we reach the age of maturity. A balky horse is apt to be always balky. A gentle kitten is apt to manifest that gentleness in early life. Changes in nature are generally slow; sudden, radical changes the exception. For this reason evidence of viciousness by an animal subsequent to an accident, acting, as it does, according to its natural instincts, is admitted." Again in refusing to hold as a matter of law that the danger was apparent, said, "Courts will not declare that mules are judicially known as vicious; neither can we do so as to stallions. * * * The jury, taken from all walks of life, were probably better fitted to pass judgment upon that than the court, and the question was properly left to them." 199 P. 938, 26 A. L. R. 866, 871.

But we do not have to reject as authorities the *Tolin* and *Miller cases* to sustain the verdict in the case at bar, for the reason that there are important distinctions between the cases. Instead we have reviewed the *Tolin* and *Miller cases* in the light of other authorities for the purposes of clearly showing that, at least, they should not be extended further by applying them as controlling or persuasive in this case.

There are three important distinctions between those cases and the case now before us.

First, in the case at hand the respondent has proven negligence of the appellant, which was the proximate cause of his injuries.

Again, on the defense of contributory negligence, the respondent testified that he did not go to the horse's heels, but that he was "standing facing the horse, more to the right side of the horse, facing it", and while in that position, the horse suddenly whirled around, without warning, and kicked him.

And finally, in this case it is an admitted fact that appellant called the respondent to the scene of his injuries, without giving him any warning, although appellant knew the horse to be dangerous, and would kick.

"From a review of all the decisions of the California appellate courts, it may be announced as the law relating to the liability of the owners of horses that if the owner knowingly keeps a mean or vicious beast, he is liable for injuries to another who has been invited to the premises where the animal is kept, * * *." *O'Brien et al. v. Gateway Stables et al.,* 104 Cal. App. (2d) 317, 231 P. (2d) 524, 526.

At the close of all the testimony the Court, upon motion of the respondent and over the objection of the appellant, struck out the plea of assumption of risk, and appellant charges error. The Trial Judge relied upon the case of *Daniel v. Tower Trucking Co., Inc.,* 205 S. C. 333, 32 S. E. (2d) 5, and quoted therefrom as follows:

"The term (assumption of risk) presupposes some danger, a knowledge thereof, a reasonable opportunity to ascertain the nature of the risk, and ordinarily implies appreciation thereof and acquiescence therein; and has been defined as the acquiescence of an ordinarily prudent man in a known danger, the risk of which he assumes by contract. 7 C. J. S., Assumption, P. 137."

Both the respondent and appellant were in agreement that the respondent knew nothing about the horse, had never seen it before, and there was no claim that there was any contractual relationship between the parties with respect to management of the horse. We find no error.

And, finally, the appellant complains of error in the Trial Judge's refusing to charge one of his requests.

The Trial Judge construed the request as a charge upon the facts, and in his language charged all principles of law contained in the request, which were sound.

Considering the charge as a whole, it was fair and covered all principles of law involved, without prejudice. *Wolfe v. Brannon,* 211 S. C. 282, 44 S. E. (2d) 833.

Judgment affirmed.

TAYLOR, Acting C. J., and OXNER, LEGGE and MOSS, JJ., concur.