144 So.2d 670 (1962)
Frank J. MERCADEL
v.
PHOENIX OF HARTFORD INSURANCE COMPANY, Inc.
No. 434.
Court of Appeal of Louisiana, Fourth Circuit.
September 4, 1962.
*671 Parnell J. Hyland, Porteous & Johnson, New Orleans, for defendant-appellant.
A. M. Trudeau, Jr., New Orleans, for plaintiff-appellee.
Before MILLER, VIDRINE and CUTRER, JJ.
MINOS D. MILLER, Jr., Judge pro tem.
This is a personal injury action arising out of an attack by a dog. Plaintiff, Frank J. Mercadel, is suing Pheonix of Hartford Insurance Company, Inc., the insurer of Dr. Stuart Landry, who owned the dog. The trial court gave judgment for the plaintiff in the amount of $1,000.00 and defendant appealed to this court.
Plaintiff and Dr. Landry, the dog owner, gave substantially the same description of the incident. Plaintiff had been engaged by Dr. Landry as a contractor to perform certain carpentry work on his home in the City of New Orleans. Plaintiff employed three other men to help him, and the job had been going on for several days prior to the incident. The dog was kept on a long chain in a little side yard which was partially enclosed. Dr. Landry gave his version of the encounter:
"Q. Were you present when the dog attacked him?
"A. I was.
"Q. You saw the whole affair and everything?
"A. Yes, sir, I did.
"Q. Would you explain to the Court what you saw, please?
"A. I was seated at lunch and I heard barking and I came out of the house and the dog had slipped off his collar and he was barking excitedly around Mr. Mercadel's helper, a man named Emile whose last name I don't recall, but he was barking excitedly around him and making a good deal of noise, and I attempted to calm the dog but he was excited and was hard to do, *672 and at this point Mercadel drove up in his car and got out and this was across the street, he came a couple of steps toward this scene and the dog then transferred his attentions to Mr. Mercadel who began backing away from the dog and the dog was barking going around in a circle and barking excitedly, and in doing this he used his sun helmet swinging this way to keep the dog make him back off and then he tripped, fell backward, and the dog then went and slashed him on the leg.
"Q. When you say the dog turned his attention from the worker to Mr. Mercadel, did you mean the dog charged over to Mr. Mercadel's position?
"A. He was going around in a circle and he sort of began circling around from one to the other and transferred his attention in this way."
Defendant contended that the dog had always been of a kind disposition, had never exhibited any vicious tendencies and the owner had no reason to suspect that it would ever bite anyone. In the alternative defendant pleaded contributory negligence contending that plaintiff excited and provoked the dog by waving his jungle helmet at the animal.
The case boils down to three questions. Was the dog vicious? If so, was its owner, Dr. Landry, aware of these vicious propensities? If the owner was aware of the dog's vicious propensities, did he provide adequate safeguards to secure and restrain the animal or was he negligent in failing to do so?
The incident itself clearly illustrates that this dog was vicious. After getting loose the dog first confronted one Emile Barbarin, one of plaintiff's workmen. This witness testified that the dog came over to the porch where he was working, growling and showing his teeth and was "standing up there with his hair rising up on his back, look like he was trying to bite me." Dr. Landry's testimony confirms the dog's menacing attitude toward Emile Barbarin. About this time the plaintiff drove up to the house, got out of the car and slammed the door. Apparently this act of door slamming attracted the dog's attention and it promptly ran toward the plaintiff snarling and growling. Plaintiff backed away from the dog, at the same time trying to ward the dog off with his jungle hat. Plaintiff stumbled, falling backwards, and the dog rushed forward slashing him on the leg. Dr. Landry pulled the dog off the plaintiff.
These encounters with the plaintiff and his workman, in the space of a few moments, leaves little doubt this dog was mean and vicious. There is not one shred of evidence that the dog was in any way provoked by either of these workers. Barbarin's waving of the hammer over his head and plaintiff's use of his jungle helmet were both measures of self defense, pure and simple.
The question of Dr. Landry's prior knowledge of the dog's vicious propensities presents more of a problem. There is uncontradicted testimony that this dog had played with neighborhood children without incident. There is no evidence that this dog had ever bitten anyone before. There are, however, other indications that Dr. Landry was aware of the dangerous propensities of this animal. He kept the dog chained at all times at home or whenever he walked the dog in areas frequented by people. The only time the dog was unchained or let off his leash was when Dr. Landry took it in the vicinity of the canal away from any inhabited area. Dr. Landry's testimony regarding the safety of these carpenters is noteworthy:
"Q. In other words, if they wanted to walk back in the alleyway where the dog was tied and you saw them going back there, would you stop them?
"A. Yes, because there might be an occasion to be dangerous, yes."
*673 The substance of Dr. Landry's testimony was that the dog would not harm any of the neighbors or people it was accustomed to but there was no guarantee for the safety of any strangers who might be on the premises, and this would include any invitees such as the plaintiff and his workmen. Thus the owner's testimony indicates his prior awareness of the dog's vicious potential.
Having established the dog's vicious nature and the owner's prior knowledge, did Dr. Landry take proper precautions to secure this animal? We find that he did not. The dog was kept on a long chain in an unenclosed yard. In the first place, as the owner himself testified, there was nothing to protect the hapless invitee should he come within the radius of this long chain. There was nothing to warn anyone of the potential danger. The yard itself was not completely enclosed. There was no evidence as to the construction of the chain and collar but whatever it was, it was not sufficient to hold the dog. A dog such as this should be kept in an enclosed and locked area of sufficient height and strength to prevent his escape. In failing to provide such safeguards, defendant's insured was negligent.
Defendant relies primarily upon the case of Marsh v. Snyder, La.App., 113 So.2d 5. In this case the plaintiff, a domestic servant, was in front of her employer's home engaging in sweeping some garbage. While she was so occupied, the defendant, accompanied by his two dogs, walked by the premises and suddenly one of the dogs bit or nipped the plaintiff's forearm. Both the plaintiff and the defendant were taken completely by surprise and defendant failed to observe what caused it to occur. The court denied recovery holding that the evidence indicated the defendant had no actual or constructive knowledge that the dog possessed characteristics which would cause injury to anyone. In the Marsh case the defendant testified that the dog was of a mild disposition and had never manifested a temperament which would cause him to assume that the animal would harm anyone. This distinguishes the Marsh case from the instant case where Dr. Landry, the dog owner, testified that a stranger or even an invitee might be in some peril should he wander within the immediate vicinity of his dog. The case of Marsh v. Snyder could be easily used as authority for allowing recovery in the instant case inasmuch as the court found that "the burden of proving freedom from fault is placed upon the owner or harborer of the animal in a majority of the cases decided by the appellate courts of this state." Clearly Dr. Landry did not carry this burden in any of the questions regarding the viciousness of the dog, his prior knowledge of these propensities, and his efforts to properly secure the dog.
Defendant stoutly maintains that the dog was actually tied up at the time of the accident and broke loose through no fault of the owner. To sustain this contention he cites the case of Thomas v. Wright, La.App., 75 So.2d 559, Alfred v. Lee, La.App., 71 So.2d 601, and Sims v. Ainsworth, La.App., 120 So.2d 371. All of these cases involve a horse or mule breaking out of an enclosure and being hit by an automobile. In the Thomas case the court attributed the animal's escape to the fact that a strange dog entered upon the defendant's premises and by barking and snapping at the tethered horse the animal became so frightened as to cause it to break loose from its rope and break out of the premises all the while being chased by the dog. The court emphasized that the animal owner could not be held to foresee such an intervening circumstance and thus found him to be without negligence. The case of Alfred v. Lee involved a suit for damages to an automobile of the plaintiff when it collided with a mule owned by defendant. The evidence showed that the fence and gate were of substantial material and substantially built. There was no evidence as to how the gate was broken down but it was simply shown that two strands of wire were broken although the posts were left standing. The court found that the *674 mule had gotten out through no fault of the owner. A close reading of the case showed that the decision turned on the point that the presence of the mule on the highway was not the proximate cause of the accident. The proximate cause was that the motorist was not keeping a proper lookout. In the instant case there was no evidence to show the quality of the collar or chain which held the dog but there was evidence which showed that the yard in which the dog was allowed to roam was only partially enclosed. The case of Sims v. Ainsworth is similar to the Alfred case and the Court of Appeal affirmed the trial judge's finding that the pasture fence was substantial and adequate for the purposes intended and the defendant could not foresee that it would be broken down. Not one of these cases cited by defendant involves a dog. Common sense would dictate that the owner of a vicious dog should take more precautions than the owner of an ordinary horse or mule.
Defendant cites the case of Arnold v. Paulsen, La.App., 52 So.2d 605, for the proposition that every dog is entitled to one bite. It is difficult for us to see how this case aids defendant in any respect as it bears no similarity to the instant case. In finding for the plaintiff, the court in Arnold v. Paulsen held that it was irrelevant whether or not the dog was vicious because here the dog owner ordered it to attack the plaintiff and because of this act of defendant's urging his dog to attack the plaintiff it made no difference whether the dog had ever manifested vicious tendencies or not.
The fact that Dr. Landry regarded the animal as a watchdog and kept this fairly large dog tied and observed certain other precautions is important in determining the propensities of the dog. In Montgomery v. Koester, 35 La.Ann. 1091, 1093, the plaintiff while walking in the public street at night was attacked by defendant's dogs and injured. Apparently the two dogs had gotten out of the gate which was either left unlatched or in some manner was open. In finding for the plaintiff, the court had this to say:
"These were watchdogs kept by defendant for the protection of his premises, and their dangerous character and knowledge thereof by defendant may be inferred from their size, their actual conduct, the admitted purpose for which they were kept, and the very care exercised in their custody; for it appears from the testimony offered by defendant that his practice was to chain up the dogs every morning at daylight and to loose them only at night.
"We think this sufficient to charge him with the scienter."
On the dog's friendly attitude toward neighborhood children and yet his different disposition toward strangers, the case of Bentz v. Page, 115 La. 560, 561, 562, 39 So. 599, is pertinent. There the court allowed recovery in a case involving an attack on the plaintiff while he was walking in front of defendant's house. The court had this to say:
"The evidence shows that the dog referred to, a red Irish Setter, did on October 19, 1903, attack plaintiff as he was passing along the street in front of defendant's residence, and, throwing him down, bit him severely on the thigh. The dog leaped the hedge fence in order to make this assault which seems to have been without provocation.
* * * * * *
"That the dog in question made a vicious attack on plaintiff is not disputed. The animal may have been kind and gentle to defendant and family, and at the same time vicious toward strangers."
The case of Reneau v. Brown et al., 9 La.App. 375, 158 So. 406, 407, is similar to the instant case both from the standpoint of the owner's treatment of the dogs and the safeguards resorted to. In finding *675 for the plaintiff the court had this to say:
"The fact that these dogs, or at least one or more of them, must have been considered vicious by those persons in charge of the premises, is shown, we think, by the treatment that these people accorded the dogs. They testified that they always kept the dogs in the rear of the premises, and never let them go outside, and were always most careful not to let them come into contact with the public. These actions on their part indicate that they knew that the dogs were dangerous * * *.
* * * * * *
"If the dogs were of this nature, it was manifestly the duty of those who had them in charge to see that the premises where they were kept were enclosed with sufficiently strong fencing to prevent their escape. The happening of this accident shows conclusively that they did not properly discharge this duty. If, as a result of their failure, the injury was sustained by the plaintiff, they should be required to compensate him for his losses."
In this particular case one of the dogs jumped against the board fence which was in such condition that it broke and the dog went through and attacked the plaintiff.
On the matter of quantum plaintiff was treated at Charity Hospital as an out patient for about two months following the incident. Approximately eight office visits were made. During the course of the treatment the wound became infected and the area was excised. Although plaintiff complained of some residual pain on the day of the trial some ten months later, if there was any it was negligible. We find no manifest error in the trial court's award of $1,000.00. See Tate, "Manifest Error," 22 Louisiana Law Review 605 (1962).
Accordingly, the judgment of the trial court is affirmed at defendant's costs.
Judgment affirmed.