176 So.2d 707 (1965)
August TAMBURELLO
v.
Andrew S. JAEGER, Jr.
No. 1804.
Court of Appeal of Louisiana, Fourth Circuit.
June 7, 1965.
Rehearing Denied July 15, 1965.
*708 Hubert, Baldwin & Zibilich, Leon D. Hubert, Jr., New Orleans, for plaintiff-appellee.
Porteous & Johnson, C. Gordon Johnson, Jr., New Orleans, for defendant-appellant.
Before SAMUEL, CHASEZ and BARNETTE, JJ.
CHRIS T. BARNETTE, Judge pro tem.
This is an action in tort for damages sustained by the plaintiff, August Tamburello, resulting from being kicked in the face by a three-month-old colt, owned by the defendant, Andrew S. Jaeger, Jr. From a judgment in favor of plaintiff in the sum of $4,000, the defendant has appealed.
The undisputed facts may be stated briefly. The defendant owned a number of horses located at his stock farm in New Orleans. Among these were a mare and colt quartered in his stable. The plaintiff, owner of a horse, rented a stall from defendant in which his horse was quartered. On May 28, 1962, plaintiff was there attending his own horse and applied medicine from an aerosol can. Defendant Jaeger asked him to go to the stall in which the mare and colt were quartered and spray some of the medicine on the colt's forehead where it had been slightly injured.
Plaintiff approached the stall and found the colt and its mother near the open window of the stall. He reached in the window, which was about waist high, and took hold of the colt by the mane. Its mother backed away and the filly moved back causing plaintiff to lean forward and extend his reach through the window, attempting to hold on to its mane. When he lost his hold on the filly, she turned around suddenly and kicked him in the face, causing serious injury to plaintiff's nose.
Plaintiff has alleged that the colt had a dangerous propensity for kicking people which fact was known to defendant and that defendant was negligent in not warning him of this danger. Defendant denies that the colt had dangerous propensities, and asserted that her behavior was not unlike that of any other three-month-old colt. Furthermore he contends that plaintiff, being an experienced horse trainer, was fully aware of the habits and propensities of young colts and assumed the risk and was contributorily negligent in not approaching the colt with proper caution.
The evidence reveals that the filly had once kicked the defendant, when, as he says, he was playing with her, jumping from side to side. This kick was severe enough to cause a bruise which defendant showed to several people, but not the plaintiff. On one other occasion the filly kicked a young lady visiting the corral, apparently without any warning. This kick, fortunately, caused no injury, but frightened the young lady who fled from the corral. This incident was communicated to defendant. The testimony does not reveal that plaintiff had knowledge of either of these prior kicking episodes.
Plaintiff seeks recovery of damages under LSA-C.C. art. 2321 which reads as follows:
"The owner of an animal is answerable for the damage he has caused; but if the animal had been lost, or had strayed more than a day, he may discharge himself from this responsibility, by abandoning him to the person who has sustained the injury; except where the master has turned loose a dangerous *709 or noxious animal, for then he must pay for all the harm done, without being allowed to make the abandonment."
Counsel for plaintiff concedes in his argument and brief that notwithstanding the apparently absolute liability imposed by the first clause of the foregoing article, the courts of this state have not applied it, as it relates to domestic animals, except in the light of Article 2315. Liability for personal injury caused by such animals may result from having knowledge of traits or characteristics of dangerous propensity and failure to warn the injured person timely. Plaintiff concedes, therefore, that the burden is upon him to prove (1) the existence of dangerous propensities, and (2) knowledge on the part of the owner of the animal. This is the test of liability which has been adopted by our courts in many cases in our jurisprudence. Kling v. United States Fire Insurance Company, 146 So.2d 635 (La.App. 1st Cir. 1962); Mercadel v. Phoenix of Hartford Insurance Co., 144 So.2d 670 (La. App. 4th Cir. 1962); Espinosa v. Hill, 138 So.2d 12 (La.App. 1st Cir. 1962); Marsh v. Snyder, 113 So.2d 5 (La.App. Orleans 1959); Hartman v. Aschaffenburg, 12 So.2d 282 (La.App. Orleans 1943).
The testimony establishes by a clear preponderance that the defendant did have knowledge that the filly had kicked the young lady and, of course, himself, and that he did not reveal this to the plaintiff or otherwise forewarn him. We must decide if the traits or characteristics of the colt exhibited by the two previous episodes of kicking were so unusual as to classify it as an animal with dangerous propensities. This question must be considered in the light of the plaintiff's experience as a horse trainer and his knowledge of the behavior of three-month-old colts. In other words, a characteristic of animal behavior may pose a dangerous propensity to a child or inexperienced person but not to one experienced in the handling of such animals.
The fact that the colt had the capacity to cause injury by kicking is self-evident, but this is not enough. It is a matter of common knowledge that all horses have this capacity; and there are certain inherent dangers in handling horses, such as being stepped on while currying, feeding, harnessing, or while preparing to mount. There is the danger of being kicked or otherwise injured by a horse subjected to sudden excitement or fear; the danger of being kicked or bitten when one disturbs a horse while eating. It is also a matter of common knowledge that some horses are by nature more gentle or more nervous or fearful than others. In other words, while horses have certain characteristics in common, they also have individual characteristics of behavior which distinguish them one from another, according to age, breed, training, environment, and experience. These facts must certainly have been known to plaintiff, an experienced horseman.
There is no presumption that domestic animals are dangerous to man or that an animal which injures another was known to its owner to be dangerous. This must be proven. It is not enough that there be a potential danger, but there must be a propensity, that is, a natural inclination to be dangerous; a proneness toward behavior not consistent with normal or expected behavior likely to cause injury. The existence of this propensity is what we must look for in the instant case.
As above stated, there were two previous episodes of kicking. Other than this evidence, there is nothing in the record to indicate that the filly had demonstrated dangerous propensities or had exhibited behavior unlike any other three-month-old colt, nor is there any expert testimony as to what is normal behavior of a three-month-old filly.
We have considered whether or not the filly in question acted in a normal manner, and whether or not all very young colts are frisky and prone to kicking episodesboth *710 with and without provocation. We concede that any opinion we might have on this question is nonexpert, unsupported by testimony, and could be in error. We believe on nonexpert opinion that it was only natural and instinctive for the filly to pull away from plaintiff and attempt to retreat with its mother to the back of the stall and when held against its will, to fight back in the only way such animals know to resist. If our nonexpert opinion is correct, then the plaintiff, an experienced horseman, knew what to expect and there was a strong element of assumption of risk and contributory negligence.
The burden of proving the dangerous propensity of the filly, as evidenced by the two previous kicking episodes, and that such was known to the defendant, is upon the plaintiff. He has discharged this burden. The burden of proving that such behavior of the filly was not evidence of a dangerous propensity, but the normal behavior of a three-month-old filly known to the plaintiff and that the plaintiff was contributorily negligent, is upon the defendant. He has not discharged this burden.
We have indicated our uncertainty as to whether the filly acted normally and exhibited behavior constructively within the knowledge of the plaintiff, an experienced horseman, but in the absence of expert testimony to support nonexpert opinion, we cannot take judicial notice of beliefs we may have on that question. The defendant has offered no testimony on the normal behavior of three-month-old colts, and therefore has failed to discharge the burden of proof of assumption of risk or contributory negligence, which is an affirmative defense.
There are many cases in our jurisprudence dealing with liability for injuries caused by domestic animals. Most of them involve attacks by dogs. The popular notion that "every dog is entitled to his first bite" has been rejected by the courts of Louisiana and elsewhere generally, and liability has been determined upon the facts peculiar to each case. Liability of the owner of a horse to a person injured or killed when kicked, bitten, knocked down, and the like is discussed at length in 85 A.L.R.2d, pp. 1161-78. Here we find restated the principle that knowledge of the owner of the horse of its vicious propensity to do the particular act complained of is necessary to recovery. The cases cited in A.L.R. are of little help to us since the decisions reached were determined by the facts in each case.
The case of Mungo v. Bennett, Supreme Court of South Carolina, 238 S.C. 79, 119 S.E.2d 522, 85 A.L.R.2d 1155 (1961), is more closely parallel to the instant case than any we have found. There the owner of the stallion was holding it with a bridle in one hand while currying it with the other. He called to the plaintiff to come to him. The plaintiff knew nothing about the horse which defendant had recently purchased. He had never seen it before. While standing near the horse's right shoulder, it suddenly whirled around and kicked the plaintiff causing severe injury. In holding the owner liable the doctrine of dangerous propensity and knowledge of the owner was applied. The Court said:
"* * * However, an examination of the review of the cases covered in this note will show that all of the courts hold that the law imposes upon the master the duty of warning a servant of the known dangerous propensities of horses and mules, which are not actually known to the servant; and this is true even though the servant be experienced in handling such animals. * * * (Emphasis added.) 119 S.E.2d at p. 526, 85 A.L.R.2d at pp. 1159-1160.
On the other hand, we quote from 85 A.L.R. 2d p. 1171:
"An action for negligence, without the element of known pre-existing viciousness on the part of the pony involved, *711 was held to lie in Smith v. Benson's Wild Animal Farm (1954) 99 N. H. 243, 109 A.2d 39, where the court reversed an order of nonsuit and ordered a new trial * * * The jury also could find, said the court, that the defendant knew, if not as a matter of common knowledge, then as an expert with special knowledge of animals, that ponies have a natural tendency to kick when disturbed, and if the trial court did not consider it as a matter of common knowledge, then proffered expert testimony should have been received that ponies are likely to kick when, while eating, they are startled by sudden noises or by the appearance of a child running by. * * *"(Emphasis ours.)
The foregoing statement seems to indicate that a greater responsibility is owed by one having "special knowledge" of the natural tendency of ponies to kick, but the importance of expert testimony is pointed out. In the cited case it was the defendant; in the instant case it is the plaintiff. This gives some support to our views expressed above, relating to plaintiff's assumption of risk and contributory negligence. However, it should be noted assumption of risk is factual, and we will not disturb the finding of the trial court in the absence of manifest error.
As indicated above the question which we find most difficult to answer is whether the filly's prior behavior manifested by the two kicking episodes was a demonstration of vicious or dangerous propensities. It kicked the defendant when he was playing with her, "jumping from side to side". The colt's kicking the young lady is unexplained. Whether or not this is enough to charge the owner with "knowledge" of "vicious" or "dangerous" "propensities" within the meaning of the law is doubtful. We are not convinced strongly enough to the contrary to justify a reversal of the trial court's finding of this fact in the absence of expert testimony of the customary behavior of three-month-old colts.
While we have had some difficulty in arriving at our conclusion that the judgment of the trial court should be affirmed on the question of liability, we are in complete agreement that the award of damages for the injury is too low and should be increased substantially.
We are not unmindful of the "much discretion" which should be allowed the trial judge in awarding damages for personal injuries and discussed this more fully in an opinion this day handed down in Mrs. Christine Davis v. Cooperative Cab Company, et al., La.App., 176 So.2d 148. As in that case we are governed here by the principles of law set out by the Supreme Court in the recent case of Ballard v. National Indemnity Company of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964).
It is stipulated that the special damages are $437.35 for medical and hospital expenses; therefore, the judgment of $4,000, inclusive of special damages, allowed only $3,562.35 for pain and suffering and for total obstruction of plaintiff's left nostril for several months with partial slight obstruction which appears to be permanent. This sum of $3,562.35 for pain and suffering, in our opinion, is manifestly inadequate and should be increased to $7,000.
The uncontradicted medical testimony is that plaintiff was given emergency treatment immediately following injury and that he suffered considerable pain. The next day a more thorough examination revealed the columella of the nose was torn loose from the face and that the nasal septum and nasal bone were fractured. The wound was stitched, repair work done on the fractures and plaintiff's nose dressed and packed. The stitches were removed a week later, but the packing remained for three weeks. This was a period of pain and discomfort with attendant difficulty in breathing.
*712 The plastic surgeon testified that by July 27, when he last saw the plaintiff before returning for surgery ten months later, the wound had healed but he noticed "there was left nasal obstruction developing". On June 10, 1963, an operation was performed to correct the obstructive symptoms. The obstruction was described by the doctor in the following testimony:
"Q What was the nature of this obstruction on the left nasal side?
"A The septum or gristle had migrated to the left and had been pulled to the left by scar tissue over a period of time, and it occluded the left nostril.
"Q To what percentage was there an occlusion of
"A Well, a significant degree, so much so that he was not able to get a clear passage of air through the left side of his nose.
"Q Did he have any trouble with the right side of his nose?
"A Some, but not as much, and the reason for that is there is a compensatory buckling to the other side.
"Q When is the last time you examined this person?
"A Well, I examined him onafter surgery, on August 1st, 1963, at which time he had good airways; and then I saw him again on February 18th, 1964, just six days ago.
"Q Right, last Tuesday; were there any complications that you saw on your last examination of February 18th?
"A The airway on the left is excellent. Now, he still has a little buckling to the right, but I don't believe it is significant, and he does have a competent airway bilaterally, but the right side is not quite as good as the left; and I mention that whatever cosmetic effect he might have had from this injury was not corrected with any of this surgery, it wasn't designed to do that.
"Q This slight blockage, can this be remedied?
"A It can be improved.
"Q What would be necessary to improve it?
"A It would be an operation similar to the one performed approximately two months after his injury, when the deviated cartilage was exposed and removed, and there was a large amount of cartilage and bone on the left that was removed. There is a very small amount remaining on the right. This can be either moved or sent back in the mid-line."
This Court affirmed an award of $7,000 for pain and suffering in Poe v. New Amsterdam Casualty Co., 154 So.2d 519 (La. App.4th Cir. 1963), caused by crushing injuries to the nose and left side of face necessitating surgical treatment twice. In addition to the nose injury, there was also a severe laceration of the knee. In its opinion the Court cited Neely v. Cotton Baking Company, 106 So.2d 811 (La.App.2d Cir. 1958), and Cush v. Griffin, 95 So.2d 860 (La.App.2d Cir. 1957), both of which have been cited by plaintiff in this case. The Neely case is relevant since it involved a nose injury, which could be relieved by surgery, and also other injuries. The award there was 4,500. Cush v. Griffin, supra, is of no value to us here since there were multiple serious injuries, and we cannot determine from a reading of that case what amount was allowed for the nose injury.
In Darden v. Zurich Insurance Company, 149 So.2d 713 (La.App.1st Cir. 1962), the Court allowed $5,000 exclusive of special *713 items of damage for injuries similar to those in this case. There were facial and dental injuries with lacerations extending into the lateral walls of the nose and dislocation and fracture of the cartilages of the nasal septum.
For slight disfigurement of an oil field worker, discomfort, pain and suffering from bruises and abrasions with lacerated nose resulting in loss of three weeks' work, an allowance of $1,100 was held adequate in Baremore v. Southern Farm Bureau Casualty & Ins. Co., 147 So.2d 58 (La.App.2d Cir. 1962).
In Hoffpauir v. Southern Farm Bureau Casualty and Ins. Co., 124 So.2d 409 (La. App.3rd Cir. 1960), the Court awarded $3,500 to a young lady for depressed fracture of the nasal bones with displacement of fragments, swelling of soft tissue for several weeks, with some residual disfigurement caused by improper alignment. She missed seventeen days from school.
We have not attempted to find a parallel case, nor do we feel bound by an award in a remotely similar case. The purpose of citing the foregoing cases is to fortify our opinion that the trial court did abuse its discretion in allowing damages considerably below what has generally been found by the courts to be appropriate in cases of this kind. We believe the sum of $7,000 for pain and suffering and permanent partial impairment of plaintiff's nasal passage would be more nearly in keeping with our jurisprudence.
For these reasons the judgment in favor of plaintiff, August Tamburello, and against the defendant, Andrew S. Jaeger, Jr., is amended to increase the award from $4,000 to $7,437.35 with legal interest from date of judicial demand until paid and, as amended, the judgment is affirmed. The defendant-appellant is cast to pay all costs of both courts.
Amended and affirmed.
CHASEZ, J., concurs.