Eric **CAMPBELL**

v.

Colonel Norman **COCHRAN.**

**STATE of Delaware**

v.

Eric **CAMPBELL.**

Superior Court of Delaware,
New Castle County.

Submitted Dec. 21, 1979.

Decided June 5, 1980.

David R. Hodas and Stephen B. Potter, Wilmington, for Eric Campbell.

Charles M. Gruver, III, Deputy Atty. Gen., Dept. of Justice, for State.

O'HARA, Judge.

Three motions are presently before the Court requiring a determination of the right to certain funds found in this State. Two cross-motions for summary judgment arise from the civil action entitled *Campbell v. Cochran*, C.A. No. 78C–DE–75. Additionally, the plaintiff in that action has filed a motion for return of property in a related criminal action entitled *State v. Campbell*, Cr. A. Nos. I–78–01–0417, 0419.

■ Procedurally, this mixed bag of criminal and civil motions presents a rather unique situation to the Court. Substantively, they involve novel and complex questions of first impression in this State concerning common law and statutory rights and duties of finders of money. Factually, the events leading up to the instant litigation are so bizarre that one might expect this tale to have been spun from the colorful imagination of Robert Louis Stevenson or Mark Twain. Therefore, due to the thoroughly unique nature of this case, the Court will set out the relevant facts, largely undisputed by the parties, in some detail.[1]

---

1. The facts referred to herein were developed through pretrial discovery in the pending civil case, through the trial on the merits in the instant criminal case, and through the official court records in three tangentially related criminal matters captioned below:

 *State v. Campbell*, Cr. A. Nos. I–77–02–0060, 0061, 0062

 *State v. Campbell*, Cr. A. Nos. I–78–01–0955, 0956, 0957

 *State v. Campbell*, Cr. A. Nos. I–78–03–0904, 0905, 0906 & I–78–01–0418.

To the extent that the Court's official records in these related criminal matters have not been directly introduced or referred to by the parties in the instant motions, the Court deems it necessary and proper to take judicial notice of such records for the purpose of resolving the instant motions. *See* 6 MOORE'S FEDERAL PRACTICE ¶ 56.11[9]. The Court notes that a judgment in a criminal action is generally held

For the sake of convenience, the Court will hereafter refer to the parties as they are denominated in the civil action. Therefore, Campbell will be referred to as "plaintiff," and Col. Cochran will be referred to as "defendant."

## I.

Early in 1977 plaintiff was indicted on multiple charges. Plaintiff entered an agreement with the State whereby he pled guilty to two counts of Burglary Third Degree and one count of misdemeanor Theft and the State dismissed all other charges. On September 7, 1977, plaintiff was sentenced on the above charges to eighteen months imprisonment to be followed by two years probation. See *State v. Campbell*, Cr.A. Nos. I–77–02–0060, 0061, 0062.

Shortly after plaintiff began serving the above sentence, he was contacted by representatives of the Wilmington Bureau of Police ("City Police") who were desirous of using plaintiff as an undercover informant. At that time the City Police were investigating a certain individual with whom plaintiff was acquainted. As a result of discussions between plaintiff, the City Police and a representative of the Office of the Attorney General, plaintiff agreed to cooperate with the City Police in their investigation of the named subject. The City and State officials agreed that in consideration of plaintiff's agreement they would join with him in moving for a reduction of his sentence. On November 4, 1977, a written stipulation containing this agreement was signed by plaintiff, a City Police official and a Deputy Attorney General, Charles Meuse, Esq. The stipulation indicated that the target suspect was known by the parties to be a violent and dangerous person, and that the State would take every precaution to preserve the confidentiality of plaintiff's identity and to assure his safety. Pursuant to the parties' agreement, a motion for reduction of plaintiff's sentence was submitted and granted on November 4, 1977. Plaintiff's new sentence suspended the term of imprisonment and substituted a three and a half year probation term.

Upon release from prison, plaintiff immediately began working as an informant with the City Police, as agreed. However, the scope of plaintiff's informant activities was soon expanded, and he became involved in a similar capacity with certain investigations being conducted by the Delaware State Police. As a further inducement to get plaintiff's agreement to perform these services, the State agreed to grant plaintiff immunity from prosecution for all past crimes he had committed, except for murder or rape.[2] Plaintiff continued to perform the agreed upon services for the State Police at least into January, 1978.

On the evening of December 10, 1977, plaintiff was equipped by the State Police with a hidden radio transmitter on his body. The State Police were interested in obtaining evidence against two individuals. One was Charles Rifon, a friend of plaintiff's, and the other person was an associate of Rifon's who was suspected of dealing in stolen goods, i. e., a "fence." The plan was for plaintiff to get Rifon to set up a meeting with the fence, so that plaintiff could sell a "stolen" typewriter to the fence which had been supplied by the State Police. Due to the limited range of the body transmitter, the officers with whom plaintiff was working had to keep within a quarter to a half mile of plaintiff. Consequently, it was

to be available as evidence in a subsequent civil action for the purpose of proving its own existence. 30 Am.Jur.2d *Evidence* § 985 (1967). Consequently, the Court's reliance on the records in the related criminal actions will be limited to the purpose of showing their existence.

**2.** The substance of this agreement is contained in a letter dated November 23, 1977 from Deputy Attorney General Meuse to plaintiff:

"Pursuant to the agreement made between yourself and the State of Delaware according to which you have agreed to assist the State of Delaware in obtaining information about the criminal activities of certain individuals, the State of Delaware will not bring prosecution against you for any acts of yours committed in the past with the exception of Murder and Rape.

"This is a binding commitment with the State of Delaware."

arranged for these officers to follow plaintiff at a reasonable distance in an unmarked car.

On the night in question, plaintiff drove his vehicle to a prearranged meeting place and picked up Rifon at approximately 8:30 P.M. Plaintiff and Rifon then proceeded to drive to a local liquor store. Although Rifon believed they were simply going to buy some beer, plaintiff had previously arranged for the State Police to begin following from this point in their unmarked car. Plaintiff and Rifon, with the officers following, then drove to the vicinity of the fence's home, but for some reason Rifon was reluctant at that time to make direct contact with the fence. Consequently, the two men decided to drive to a secluded area, colorfully known as "Bazoobie Land," apparently to drink their beer and pass the time.

Bazoobie Land can most accurately be described as an unauthorized junk yard. It is located in a relatively remote section of New Castle County and was used generally by persons wanting to dump trash. There is also evidence indicating that Bazoobie Land was a popular dumping ground for thieves who desired to get rid of stolen cars and safes. Rifon, himself, had on more than one occasion abandoned stolen safes in Bazoobie Land after removing the contents.

Plaintiff and Rifon arrived at Bazoobie Land at approximately 11:00 P.M. As they were walking through the area Rifon spotted a safe which he recognized as one he had stolen and then abandoned in the area in 1974. The door to the safe had been removed by Rifon in 1974 at which time he also removed all of the safe's contents. When the safe was found on the night of December 10, 1977, it was lying on its face frozen to the ground so that the inside compartment was concealed from view. Plaintiff hit the safe with a large rock to break it loose from the ground, and the men turned the safe over.

At this point the men discovered a package wedged inside the safe. The package was wrapped in green plastic and covered with tape. Although they could not immediately see what was in the package, neither plaintiff nor Rifon was a naïve babe in the woods (more accurately, they were not naïve babes in Bazoobie Land). It was apparent that the package had been purposely placed in the safe by someone, as Rifon had completely emptied the safe before abandoning it in 1974. Moreover, as both men knew, Bazoobie Land was sometimes frequented by other members of the criminal element. They were, therefore, not anxious to wait around with the package and possibly be discovered themselves. Consequently, the men carried the package to the top of a hill some distance from the safe before attempting to ascertain its contents.

It is important to reiterate here that while these events were occurring, the conversations between plaintiff and Rifon were still being monitored by the State Police officers, who were parked in their car somewhere near Bazoobie Land. Rifon, who was still unaware of the radio transmitter, was apparently talking in an excited manner about the discovery, while plaintiff kept telling Rifon to be quiet.

Upon reaching the top of the hill, plaintiff and Rifon partially tore the package open to see what they had found. Mere words are probably inadequate to describe the amazement of the two men when they discovered that the package contained several bundles of United States currency in $5, $10. $20, $50 and $100 denominations. The money was not new, i. e., the bills were not in serial number sequence, but the bills were not frayed or torn and the package did not appear to have been in the safe for a long time. Rifon began exclaiming excitedly that they were rich. Plaintiff kept telling him to be quiet and suggested that they take the money to a motel room and split it. Plaintiff's words, as recorded by the State Police officers, upon opening the package were as follows:

"Just be quiet. Hear me, Just be quiet. Don't say nothing, you just think, and I'll think, we got to get out of here. I got money for a motel room (unintelligible) [sic] we'll split it 50/50 and then we're gone.

"We got $20,000 in cash, we got to go count it and take care of it.

"We got to lay this money out somewhere. We can't cut it up and start spending it. We have to count it, wrap it back up and hide it.

"I want to get out of the Valley." See affidavits of Officers Capuano, Maher, and Ford, attached to defendant's answering brief.

The men then began to walk back to plaintiff's car, but plaintiff stopped momentarily to pick up the typewriter which the State Police had given him and which he had earlier carried away from the car. While thus engaged and out of Rifon's immediate presence, Campbell spoke to the State Police officers through the hidden transmitter, saying:

"Hang on guys. We hit it big. Bear with me. I repeat—bear with me. Don't stop me now."

See affidavits of Officers Capuano, Maher, and Ford, attached to defendant's answering brief.

Plaintiff and Rifon got into plaintiff's car and drove away from Bazoobie Land. As they were leaving the area, plaintiff observed the State Police officers sitting in their car. Plaintiff began driving on Rt. 82 toward Wilmington, and the officers began to follow. However, after a few minutes plaintiff reversed direction and headed north toward the nearby Pennsylvania State line. The two men continued north until they reached a motel in Chadds Ford, Pennsylvania. After checking into the motel, under an assumed name, and switching off the radio transmitter, plaintiff accompanied Rifon and the money up to their room. The men took the money out of the package and laid it out on a bed. They found that the package contained a total of $136,000 arranged roughly by denomination in one thousand dollar packets. Some of the packets were bound by bank wrappers and others by rubber bands.

After counting the money, plaintiff left the room momentarily, telling Rifon he was going for sodas. While out of the room, plaintiff telephoned the State Police headquarters and left a message for Officer Ford that he and Rifon had found "a lot of money." Plaintiff returned to the room where he and Rifon divided the money equally, each placing his share in a separate pillow case. The men then left the motel and drove back to Delaware. While driving back plaintiff told Rifon about the hidden radio transmitter and the fact that the police had been monitoring them while they were in Bazoobie Land. The two decided to avoid the police for the time being and went to the home of Rifon's girlfriend, arriving at approximately 1:30 A.M. on December 11, 1977.

While at the girlfriend's house, plaintiff and Rifon decided that since the police officers knew they had found some money they would have to turn something over to the State Police. The only figure mentioned while the officers had been monitoring the conversations was $20,000. Figuring that the officers would be suspicious if they turned in precisely $20,000, the two decided to admit to finding $16,000. Plaintiff then telephoned Officer Ford, told him of the discovery, and arranged to meet the officers at a local hotel. Each man took $8,000 to their meeting with the police officers, turned it over, and received a common receipt from the State Police for the total $16,000.

At approximately 6:00 A.M. on December 11, plaintiff and Rifon returned to Bazoobie Land with the officers to show the scene where the money had been found. The police stayed to investigate the scene while plaintiff and Rifon returned to the girlfriend's house to pick up the remainder of the money. Upon reaching the girlfriend's house, Rifon gave one of the pillow cases containing money to plaintiff and shortly thereafter the two men parted company.

Sometime later the same day plaintiff met with his uncle to seek advice on how to proceed but none was forthcoming. Plaintiff then decided to go to his uncle's house and hide his share of the money. While at this house plaintiff again counted the money and found that instead of the $60,000 that was supposed to be in the pillow case,

there was only approximately $50,000. He placed this money in a flight bag and secreted it inside a hollow wall in the house.

On December 12, 1977, Rifon, who had been questioned further by police officers concerning the money, agreed to take a polygraph examination. Rifon repeated the story that he and plaintiff had agreed upon, but the police were not satisfied with the test results. After Rifon left the police he called plaintiff saying he wanted to turn over all the money, but plaintiff disagreed. Rifon, who was then on probation stemming from unrelated matters, was becoming increasingly worried about the events of the past two days, so he contacted an attorney and fully discussed the matter. Upon the advice of counsel Rifon returned to the State Police Headquarters on either December 12 or 13, 1977, gave a complete statement about the events of the past few days, and turned in the remaining $60,000 that had been in his possession.

Armed with the knowledge of the full amount of money that had been found, police officials increased pressure on plaintiff to turn in the remainder of the money in his possession. At the request of the police, plaintiff agreed to take a polygraph examination on December 14, 1977. Plaintiff was examined concerning the facts pertaining to the found money and initially maintained that he had already turned over to the police the full amount he had found. Plaintiff had also been examined previously concerning unrelated criminal matters in which he was a suspect and which were concurrently being investigated by the law enforcement officials.[3] At some point following these examinations, the police confronted plaintiff with the fact that they

had learned from Rifon the full amount of the money found, demanded that plaintiff admit that he had more money and that he turn it over to the authorities. Plaintiff was still reluctant, but claims the police officers indicated that if he cooperated with them on the money investigation they would try to help plaintiff in regard to the unrelated criminal matters being concurrently investigated at that time.[4] In any event, sometime during the early afternoon of December 14, plaintiff finally admitted that he had hidden the remainder of the found money at his uncle's house. He then accompanied the police officers to his uncle's house, retrieved the bag containing the money, and delivered it into the possession of the police officers.

Upon returning to their headquarters, the police officers counted the money in the bag and determined that there was only $50,000 instead of the $60,000 that plaintiff should have had according to Rifon's statement. Further police questioning of plaintiff ensued in which plaintiff denied keeping or spending the missing $10,000 or any portion thereof. Plaintiff has continuously maintained that as of December 14, 1977 he had delivered to the State Police all of the found money which had been in his possession. Plaintiff requested the State Police to give him a receipt for the money delivered by him on December 14 as had been done for the money delivered on December 11, and such a receipt was eventually prepared by the State Police. However, on direct order of Deputy Attorney General Meuse, the State Police refused to give the receipt for the funds delivered on December 14 to plaintiff. The total amount of money delivered by plaintiff into defendant's custody was $58,210.

---

3. These matters, for which plaintiff was subsequently prosecuted, concerned a burglary of a local business on or about December 4, 1977, see *State v. Campbell*, Cr.A. Nos. I–78–01–0955, 0956, 0957, and plaintiff's attempts on or about November 12, 1977 and December 2, 1977 to obtain certain property belonging to plaintiff, from the State Police, by presenting an allegedly forged court order for return of property. See *State v. Campbell*, Cr.A. Nos. I–78–03–0904, 0905, 0906 and I–78–01–0418.

4. This fact, *i. e.*, the police's offer of a "deal" on the criminal matters in return for plaintiff's agreement to turn over the remainder of the found money, is disputed by defendant. Under the Court's legal analysis, to be delineated shortly, this dispute is not material to any issues raised by the instant motions and therefore need not be resolved. However, the Court notes that there is sufficient evidence in the record for a jury to find either way, *i. e.*, that there was or was not a police offer of a "deal" to plaintiff.

The defendant has never ascertained the true owner of this money or the source from whence it came prior to being placed in the safe in Bazoobie Land by some unknown person despite an extensive investigation and the significant publicity attendant on this case. The defendant *still* retains possession of these funds.

In order to fully complete the background picture pertaining to this money and the ongoing relationship between plaintiff and representatives of the State, it is necessary to briefly review certain matters which occurred subsequent to the events of December, 1977.

Between January and March, 1978, plaintiff was indicted on a host of charges stemming from three separate incidents. First, in the instant criminal case, plaintiff was indicted on charges of Theft and Conspiracy Second Degree. See *State v. Campbell*, Cr.A. Nos. I–78–01–0417, 0419. The factual basis for these charges was the failure of plaintiff to turn over to the police the full amount of found money between December 10 and December 14, 1977, and the alleged failure of plaintiff to turn over the $10,000 never recovered by the police. *See* 11 *Del.C.* § 842. Following a trial, plaintiff was acquitted by a jury on these charges, on July 3, 1978.

Plaintiff was also indicted on charges of Theft, Forgery Second Degree, Tampering with Public Records First Degree, and Attempted Theft. See *State v. Campbell*, Cr.A. Nos. I–78–03–0904, 0905, 0906, and I–78–01–0418. These charges were based on allegations that sometime prior to November 12, 1977, plaintiff had removed the original copy of a motion for return of property, and an attached proposed order in another criminal case, from the court files, forged a Superior Court trial judge's signature thereto, and on November 12, 1977 presented this order to the State Police and thereby obtained certain property. The

charge of Attempted Theft was based on an allegation that plaintiff presented a second forged order to the State Police on December 2, 1977, but did not obtain any property at that time.

Plaintiff represented himself at the first trial on these charges and was convicted on all counts. On July 7, 1978, he was incarcerated at the Delaware Correctional Center to begin serving a collective ten year prison sentence for this conviction.[5] On May 24, 1979, following an appeal, the Supreme Court remanded this case back to the trial court for an evidentiary hearing concerning possible misconduct by a Deputy Attorney General during the first trial. On June 29, 1979, the trial court found prosecutorial misconduct in that a Deputy Attorney General, not connected with the case, had sought to "advise" plaintiff on strategy and tactics in conducting his defense; consequently, a new trial was ordered. At the second trial plaintiff was represented by counsel. At the close of all the evidence, the Court ordered a directed verdict of acquittal as to all charges. The basis for the Court's ruling as to the Theft, Forgery and Tampering charges was that all alleged acts of plaintiff relating thereto occurred prior to November 23, 1977. Consequently, prosecution for these alleged crimes was barred by the November 23, 1977 blanket grant of immunity given by the State in return for plaintiff's services as an informant.[6] As for the Attempted Theft charge, the Court found, as a matter of law, that the property which plaintiff was attempting to obtain from the State Police with the allegedly forged order belonged solely to plaintiff. The Court's order for a directed verdict was entered on January 31, 1980.

Lastly, in January, 1978, plaintiff was also indicted on charges of Burglary Third Degree, Theft, and Conspiracy Second Degree. See *State v. Campbell*, Cr.A. Nos. I–78–0955, 0956, 0957. The factual basis

5. The Court notes that on July 6, 1978, the day before plaintiff began serving this sentence, an article appeared on the front page of *The Morning News* concerning his recent acquittal on the theft of found money charge. This article detailed *inter alia* plaintiff's former role as an undercover informant for the State Police. See Plaintiff's Reply Brief, Exhibit 1.

6. See letter from Deputy Attorney General Meuse, n. 2, *supra*.

for these charges was an incident on December 4, 1977 in which plaintiff allegedly burglarized a local tavern. On March 26, 1979, plaintiff entered a guilty plea to the Theft charge, and the State dropped the other two charges. On May 9, 1979, plaintiff received a two year prison sentence on this charge. After plaintiff's conviction and sentence on the first trial in Cr.A. Nos. I–78–03–0904, 0905, 0906 and I–78–01–0418 was vacated on remand, his two year sentence on this Theft guilty plea was retroactively made effective to July 7, 1978 in order to give him proper credit for the time he had been serving in prison. Plaintiff has only recently been granted a conditional release from prison on this sentence and is, therefore, no longer incarcerated.

## II.

The basic dispute between plaintiff and defendant centers on the question of which of these parties is entitled to the $58,210 found by plaintiff and turned over to defendant. All three of the instant motions seek a resolution of this basic question.

In the civil action at bar plaintiff claims that he is legally entitled to the money as the finder thereof under either statutory or common law of Delaware. Defendant claims that the common law regarding found money has been entirely preempted by an act of the Legislature, codified at 11 Del.C. § 8307(c), and that pursuant to this statute the money properly belongs in defendant's possession. The pending cross-motions for summary judgment are forthrightly directed at resolving these critical issues.

The criminal case at bar, as explained above, was based on the State's claim that plaintiff unlawfully exercised control over the found money with the intention of appropriating it to himself and without taking reasonable steps to return it to its owner.[7] The found money, or more precisely a photograph thereof, was introduced at trial by the State as evidence of the alleged crime. Plaintiff was acquitted by the jury on the charges.

Plaintiff argues in his criminal motion that under these facts the State's alleged right to retain the money is governed by 11 Del.C. § 2311.[8] Plaintiff then argues that the State has no such right because the money was not obtained during or used in the commission of a crime and possession of the money is not itself unlawful. Plaintiff further contends that the only way in which defendant could lawfully retain possession of the money is by instituting forfeiture proceedings pursuant to Criminal Rule 41.1. Because defendant has never initiated a proper forfeiture action, and such action is now barred by the applicable statute of limitations, 10 Del.C. § 8115, plaintiff argues that the found money must be returned to him.

The flaw in plaintiff's argument on the criminal motion is his assumption that

7. Plaintiff was charged with violating 11 Del.C. § 842 which provides:

"A person commits theft when, with the intent prescribed in § 841 of this title, he exercises control over property of another person which he knows to have been lost or mislaid, or to have been delivered under a mistake as to the identity of the recipient or the nature or value of the property, without taking reasonable measures to return the property to its owner."

8. 11 Del.C. § 2311 provides:

"(a) The following disposition shall be made of any papers, articles or things validly seized:

(1) If the papers, articles or things were obtained as the result of the commission of a crime, they shall be returned to their lawful owners;

(2) If the papers, articles, or things were allegedly used in the commission of a crime, they shall be returned to the person from whom seized if such person is not thereafter duly convicted of the alleged crime; but if such person is duly convicted of the alleged crime, the papers, articles and things shall be disposed of as the court directs;

(3) If possession of the papers, articles or things seized is unlawful, they shall, upon petition, be disposed of as any Judge of the Superior Court directs.

(b) Any papers, articles or things validly seized may be retained by the police for a reasonable length of time for the purpose of apprehending the offender or using the papers, articles or things so seized as evidence in any criminal trial, or both."

defendant's right to retain the money must exclusively be determined under 11 *Del.C.* § 2311. In cases where the State seizes items as evidence of a crime and makes no other claim of right to retain such property, subsequent failure by the State to prove the crime or to show that the seized property is contraband, will usually, under § 2311, terminate the State's right to retain the property. However, where the State or its agent, the defendant herein, asserts an interest in the property completely independent of § 2311, the fact that the State has no right to retain the property under § 2311 is totally irrelevant.

The same may be said of plaintiff's argument based on the forfeiture statute of limitations. Defendant has not sought forfeiture of the found money, so the fact that it is now too late to institute such a proceeding is irrelevant, especially since defendant's claim to the money is not based on any forfeiture statute. Rather, defendant's claim to the money is based entirely on the provisions of 11 *Del.C.* § 8307(c).

■ On the basis of the foregoing analysis, the Court has determined that plaintiff is not entitled to relief on his criminal motion for return of property. Moreover, even if the Court were to grant plaintiff relief on the criminal motion, the controversy between the parties would not end there, since defendant would still be entitled to a determination of his rights under 11 *Del.C.* § 8307(c) in the pending civil case. Consequently, the Court will deny plaintiff relief

on his criminal motion for the additional reason that all rights and obligations of the parties may be fully adjudicated only in the context of the civil case. Having so disposed of the criminal motion, the Court will now turn to consideration of the critical issues as raised by the cross-motions for summary judgment in the pending civil action.

### III.

Although several other issues have been raised by the parties on the cross-motions,[9] the primary issue to be decided is the extent to which 11 *Del.C.* § 8307(c) has preempted the common law pertaining to rights in found money. As this is a question of first impression, the Court must necessarily examine the historical common law background which preceded enactment of the statute.

### A.

The pertinent statute, 11 *Del.C.* § 8307(c), provides as follows:

"Whenever any lost, abandoned or stolen money comes into the custody of the State Police, the Superintendent of the State Police shall make a reasonable effort to locate the owner thereof. If the owner of any stolen money cannot be located or fails to claim such stolen money within 1 year from the date that it came into the custody of the State Police, such money shall become the property of the State Police Retirement Fund in the

**9.** In addition to his state law claims, plaintiff has raised a claim for damages allegedly arising under 42 *U.S.C.* § 1983 and for attorney fees under 42 *U.S.C.* § 1988. Defendant has only recently moved to strike or dismiss these federal law claims, and further argues that he has the option of removing these claims to federal court pursuant to 28 *U.S.C.* § 1441. The issues relating to these federal law matters have not been adequately addressed in connection with the pending cross-motions. Consequently, the Court will not address these issues herein but will reserve decision on all federal law issues until they have been fully briefed by the parties.

Two claims were voluntarily waived by the parties in connection with the cross-motions. First, defendant has waived any claim to the

money based on an alleged agency relationship between the parties at the time of the finding. Second, plaintiff's co-finder, Charles Rifon, also sued the instant defendant for return of the $68,000 which he turned in and which was never claimed by the true owner. See *State of Delaware ex rel., Rifon v. Cochran*, C.A. No. 79C–FE–34. That lawsuit was ultimately settled between the parties with the defendant returning approximately $48,000 to Rifon and retaining approximately $20,000. Plaintiff herein initially made a claim for the $20,000 retained by defendant from the *Rifon* settlement. This claim was abandoned by plaintiff during briefing on the cross-motions. As these matters have been disposed of by the parties, the Court need not and does not express any opinion relating thereto.

same manner as other sums contributed thereto. If the owner of any lost or abandoned money cannot be located or fails to claim such lost or abandoned money within 1 year from the date that it came into the custody of the State Police, such money shall become the property of the person who delivered custody of such money to the State Police and shall be returned by the Superintendent to such person as soon as is practicable."

This statute, which became effective June 28, 1977, and has never been construed in any reported case, was preceded by another statute enacted in 1955. See 50 Del.Laws, c. 239, § 1. The prior statute was never construed in any reported decision. However, it is sufficient for present purposes to note that the primary difference between the two is that the former statute gave the true owner of found money in the possession of the State Police three years within which to make a claim therefor and further provided that if no valid claim was made such money would in all cases become the absolute property of the Police Retirement Fund. Under the present statute the limitation period is reduced to one year and thereafter the money may become the absolute property of either the finder or the Police Retirement Fund, depending on the circumstances.

Prior to the enactment of these statutes the expressed civil common law in Delaware relating to found property apparently consisted of a single reported decision. In *Clark v. Maloney*, Del.Super., 3 Del. 68 (1840), the court held that "the finder of a chattel, though he does not acquire an absolute property in it, yet has such a property, as will enable him to keep it against all but the rightful owner." The *Clark* formulation was entirely consistent with the general common law rule accepted by the overwhelming majority of jurisdictions in this country, *i. e.*, that a finder has superior title in found goods as against the entire world except for the true owner. Consequently, although *Clark v. Maloney* is the only reported Delaware decision dealing with the subject, it shows an acceptance of the generally held common law principles relating to found property. Therefore, it is to these principles that the Court will initially turn for guidance in deciding the issues presented by the pending cross-motions.

Under the common law all found property, including money, was generally delineated into four categories as defined below:

■ **1. LOST PROPERTY:** that which the owner has involuntarily parted with through neglect, carelessness or inadvertence and the whereabouts of which is unknown to the owner;

■ **2. MISLAID PROPERTY:** that which the owner has intentionally laid down in a place where he can again resort to it, and then forgets where he put it;

■ **3. ABANDONED PROPERTY:** that to which the owner has voluntarily relinquished all right, title, claim and possession, with the intention of terminating his ownership, but without vesting ownership in any other person, and with the intention of not reclaiming any future rights therein; and

■ **4. TREASURE TROVE:** gold or silver coin or bullion, or money, which has been concealed by the owner in a private place for safekeeping; treasure trove carries the thought of antiquity, *i. e.*, it must have been concealed sufficiently long so as to indicate that the owner is probably dead or unknown. See generally, 1 Am.Jur.2d *Abandoned, Lost, etc., Property* §§ 1, 2, 4 (1962); 1 C.J.S. *Abandonment* § 1 (1936); 36A C.J.S. *Finding Lost Goods* § 1 (1961). For present purposes, one major distinction between these various characterizations is that only lost property involves an element of involuntariness. The three remaining categories involve voluntary and intentional acts by the true owner in placing the property where it is eventually found by another.

■ As to the finder's right to possession, the common law held that as against all but the true owner the finder had superior title to lost property or treasure trove. 1 Am.Jur.2d *Abandoned, Lost, etc., Proper-*

ty §§ 19, 21. Moreover, the finder of abandoned property who appropriated it to his own possession acquired absolute title thereto. *Id.* § 18. However, the right of possession to mislaid property was held to be in the owner of the premises where such property was found. The finder of such property acquired no right thereto, and the true owner still had supreme title to mislaid property. *Id.* § 23. The true owner's rights in treasure trove, lost or mislaid property continued from the time of the finding until such time as the limitation period expired for actions seeking recovery of the found property from the finder in possession. *See id.* § 25. Absent a statute providing otherwise, the State had no right to found property as against the finder.[10]

The common law also placed certain duties on finders of property. The finder of lost property or treasure trove had no duty to take possession of the found property, but if he chose to do so he had a duty to keep the property safe and return it to the true owner on demand. *Id.* §§ 28–29. Moreover, the finder of such property was required to take reasonable steps to find the true owner. *Id.* The finder of mislaid property was required to turn it over to the owner of the premises where it was found, who then had the duty to protect the prop-

erty and return it to the true owner. *Id.* § 30. In Delaware, the duty to take reasonable steps to find the true owner of found property was enforced primarily through the criminal law relating to larceny. *See, e. g., State v. Dredden*, Del.Ct.Gen.Sess., 73 A. 1042 (1907). This requirement has now been codified in 11 *Del.C.* § 842.[11]

While there are a myriad of other common law rules pertaining to found property, the preceding explanation will suffice for present purposes. Other pertinent aspects of the common law will be raised where necessary in the remaining discussion.

### B.

Having discussed the common law, it is now appropriate to examine the precise terms of § 8307(c)[12] in order to ascertain its relevance to the instant controversy.

On the face of the statute, two major observations can readily be made concerning its relationship to the common law. First, the statute does not expressly include all of the common law categories of found property, nor is it limited thereto. Of the common law categories, the statute refers only to "lost" or "abandoned" money. Additionally, it includes a new category for "stolen" money. Presumably, under the

---

**10.** Interestingly, under the English common law treasure trove became the property of the Crown. It was the Crown's desire to appropriate such property for purposes of state that originally resulted in the common law distinction between treasure trove and lost property. 1 Am.Jur.2d *Abandoned, Lost, etc., Property* § 21. In any event, this particular aspect of the common law apparently did not survive the voyage across the Atlantic Ocean, for no State has ever claimed sovereign entitlement to treasure trove. *Id.; see also* Million, *Sawyer et al. v. Administrator of Injun Joe*, 16 Mo.L.Rev. 27, 31–32 nn. h & 14 (1951).

The Million article just cited is an excellent reference for two reasons. First, it contains an extensive survey of the common law relating to found property. Second, the article consists of an annotated mythical case decided by the Missouri Supreme Court in 1841 which arose from the finding of $12,000 in gold coins by those adolescent heroes of yore, Tom Sawyer and Huckleberry Finn. *Sawyer et al. v. Administrator of Injun Joe* is as fantastic a case on its facts as this Court has been able to find, and as such shares a far greater kinship with the case

at bar than any non-fictional case cited by the parties or discovered by the Court's own research. For purposes of comparison (as well as some delightful and worthwhile diversion) readers are referred to the "record" in *Sawyer, i. e.,* Mark Twain's THE ADVENTURES OF TOM SAWYER (1875). However, lest the reader be tempted to infer too much of philosophical import from the late Mr. Twain's work, the Court hastens to make additional reference (with appropriate apologies to the deceased author) to the following notice which prefaced the parallel work of THE ADVENTURES OF HUCKLEBERRY FINN (1884):

"Persons attempting to find a motive in this narrative will be prosecuted; persons attempting to find a moral in it will be banished; persons attempting to find a plot in it will be shot." "BY ORDER OF THE AUTHOR."

**11.** See n. 7, *supra.*

**12.** See Section III. A., *supra.*

common law any of the four categories could include money which had been stolen and then lost, abandoned, mislaid or concealed for safekeeping. Second, the statute creates a right in the Police Retirement Fund to gain absolute title to "stolen" money if the statutory preconditions are satisfied. Under the common law no such right existed.

 Defendant argues that § 8307(c) completely preempts the common law relating to found money and implicitly requires the finder to make a "good faith" delivery thereof to the State Police. Defendant then asserts that plaintiff did not make a "good faith" delivery to the proper authorities and is, therefore, barred from making a claim to the funds. Plaintiff naturally disagrees and argues that because the statute is in derogation of the common law it must be strictly construed. Applying such a construction, plaintiff contends that this Court should not read into the statute any delivery requirement, in "good faith" or otherwise, as the Legislature has not expressly provided therefor. Plaintiff similarly argues that the statute does not extinguish the common law categories not expressly included therein, and that under the common law or the statute he has a superior right to the found money. In the final analysis, the question is one of legislative intent and "the Court must seek to ascertain and give effect to the intention of the Legislature as expressed in the Statute itself." *Keys v. State*, Del.Supr., 337 A.2d 18, 22 (1975) (citations omitted).

Obviously, § 8307(c) does preempt the common law in situations where it applies by its clear terms. Therefore, in the case *sub judice* if it be determined that the found money was in fact "lost, abandoned or stolen," § 8307(c) will be dispositive since the money in fact "came into the custody of the State Police . . . ." The parties appear to have no quarrel with this proposition, as it flows quite clearly from the explicit language of the statute. However, the issues which have spawned the parties' statutory disagreement, *i. e.*, whether the statute precludes plaintiff's reliance on pri-

or common law principles and whether plaintiff is barred from recovery because of his alleged failure to make a "good faith" delivery of the funds to the State Police, are not answered so readily by reference to the language of § 8307(c) since nothing is explicitly stated concerning these issues. Each issue presents a distinct question of legislative intent and will thus be addressed separately.

 The question of plaintiff's reliance on the common law categories not expressly mentioned in § 8307(c) turns on the definition to be given the terms "lost, abandoned or stolen money." These are not defined in the statute. As indicated above, the common law did not concern itself with "stolen" money as distinguished from any of the four basic categories of found property. It appears quite clearly from the statute, however, that the question of whether found money may properly be characterized as "stolen" is now of critical importance. The Court, therefore, holds that if the statute is otherwise satisfied, the determination that found money was "stolen" will ultimately give rise to absolute ownership thereof in the Police Retirement Fund, regardless of whether under the common law such money would have qualified as lost, mislaid, abandoned property or treasure trove.

 A closely related question remains, *i. e.*, if the found money is determined not to have been stolen, then to what extent will rights in the money be determined under the common law? The Court has concluded that in cases where found money has, in fact, come into the custody of the State Police, the statute has preempted the common law categories *in toto* and all rights in such money are to be determined under the statute. Several considerations compel this result.

First, the fact that the Legislature created an entirely new category of found money, *i. e.*, "stolen" money, which was unknown to and is inconsistent with the common law evidences the Legislature's intent not to be bound by the technical common law categories. Moreover, a contrary con-

clusion would yield rather startling results due to the mixed bag of common law and statutory categories. A confusing multi-tiered analysis would be required to ascertain the rights of potential claimants in found money after it had been held by the State Police for the statutory period. If the money was "stolen," then the Police Retirement Fund would acquire absolute title. If it was "lost" or "abandoned" money, the finder would acquire absolute title. However, if it was "treasure trove," the finder would be entitled only to possession of the money, not absolute title which would remain in the true owner; and if it was "mislaid" money, the right to possession would be in the owner of the premises where it was found and title would remain in the true owner. It is simply inconceivable to this Court that in enacting § 8307(c) the Legislature could have intended such a confusing result. Consequently, where, as here, the statute otherwise applies by its terms, the Court holds that § 8307(c) has preempted the common law categories of found money. In other words, found money which under the common law would have been "lost, mislaid, abandoned property" or "treasure trove" falls within the statutory terms "lost or abandoned money" unless the facts indicate such money was "stolen."

The final question of statutory construction which must be addressed is whether the statute implicitly requires "good faith" delivery of found money to the State authorities in order to entitle the finder to the benefits of the statute. Defendant argues that such a requirement must be read into § 8307(c) in order to give effect to the legislative intent "to reward the good faith finder of property who returns it to the State Police." Defendant's argument is as circular as the proverbial Catch-22: The statute requires "good faith" delivery because the Legislature intended to reward those finders who make a "good faith" de-

livery of found money to the State Police. The only problem with the argument is that there is nothing on the face of § 8307(c), or any other relevant statute,[13] indicating a legislative intent to require finders of money to turn it over to the State Police, in "good faith" or otherwise. Surely, had the Legislature desired to work such a radical change in the law pertaining to a finder's duties, it would have so provided in express terms which might be reasonably calculated to forewarn such persons of their obligations. *Compare Hurley v. City of Niagara Falls,* N.Y.Supr.App.Div., 30 A.D.2d 89, 289 N.Y.S.2d 889 (1968), *aff'd.,* N.Y.Ct.App., 25 N.Y.2d 687, 306 N.Y.S.2d 689, 254 N.E.2d 917 (1969) (statute expressly required finder of lost property to deliver same to owner or municipal authorities within ten days; despite fact that finder failed to turn over found money to police for nearly two years, and then did so only when compelled by a lawsuit, the court awarded money to finder when statutory holding period elapsed, regardless of the absence of a "good faith" delivery).

An additional question, for which no statutory answer is provided, arises if defendant's proffered "good faith" delivery requirement is read into § 8307(c): When no such delivery is made, who is entitled to the found money? Even if the Court were to accept defendant's initial premise, there is simply no basis in statutory or common law for concluding that as between the "bad faith" delivering (or non-delivering) finder and the State or its representatives, the latter should prevail. In order to reach the result essentially argued by defendant in this case, the Court would have to engage in a rather elaborate process of "statutory construction." To do so would strain the Court's statutory interpretive powers far beyond their proper limits. Consequently, the Court must reject defendant's proffered interpretation of § 8307(c) and

13. See 11 *Del.C.* § 842, *supra.* n. 7. Obviously, § 842 has an element of "good faith" to it, but equally obvious is the fact that the statute does not require delivery of found property to the police.

hold that there is no requirement under Delaware law that a finder of money deliver it to the State or its representatives if the State is not the owner thereof.[14]

■ The practical result of the Court's holdings is that where money is found and delivered into the custody of the State Police, the common law concerning rights to such money is entirely preempted by § 8307(c). However, there is no requirement that found money be delivered to the State Police, and if the State Police do not acquire custody thereof, the common law

will control its ultimate disposition. The Court believes that the laudatory purpose behind the statute, *i. e.,* to improve the true owners' chances of recovering their property by *encouraging* delivery of found money to the State Police, will be served by the decision reached herein, since the finder who does, in fact, deliver found money to the State Police will have an opportunity to acquire absolute title, not merely possession, after only one year, in addition to avoiding (hopefully) prosecution under the theft statute.

14. Defendant's continued references to plaintiff's alleged "bad faith" in failing to turn all of the found money over to the State Police for four days are made with poor grace, considering the substantial evidence of bad faith by the State's representatives in their relations with plaintiff following the finding of the money. For example, consider the following:

In *State v. Campbell,* Cr.A. Nos. I–78–03–0904, 0905, 0906 and I–78–01–0418, the State twice tried plaintiff on three charges which were clearly covered by the November 23, 1977 blanket grant of immunity to plaintiff, as all had occurred on or prior to November 12, 1977. The fourth charge was for Attempted Theft of property which the evidence showed belonged to plaintiff. Despite these facts, plaintiff was convicted in the first trial at which he represented himself. This conviction was eventually vacated when the trial court determined that the first trial was tainted by prosecutorial misconduct, *i. e.,* a Deputy Attorney General not involved directly in the case sought to "advise" plaintiff on trial strategy and tactics in conducting his defense. However, on July 7, 1978, prior to the vacating of this conviction, plaintiff was returned to prison to serve the sentence thereon.

On July 3, 1978, plaintiff won acquittal by a jury on charges that he had stolen the found money. See *State v. Campbell,* Cr.A. Nos. I–78–01–0417, 0419. The State's insistence on prosecuting these charges naturally resulted in a public trial. Following plaintiff's acquittal, on July 6, 1978 an article appeared on the front page of a local newspaper which, besides relating where and how plaintiff found the money, also detailed plaintiff's former role as an undercover informant for the State Police. Even if the State's decision to prosecute on these charges was not a breach of an express promise of confidentiality by the State to plaintiff (which it probably was, as evidenced by the November 4, 1977 written stipulation), it was at least an outrageous breach of an implied promise of confidentiality to plaintiff in return for the dangerous service which he was to perform for the State, since the fact that plain-

tiff was working as an undercover informant at the time the money was found would necessarily be revealed during the trial on these charges. Some evidence of the gravity of this breach may be found in plaintiff's testimony during his second trial in Cr.A. Nos. I–78–03–0904, 0905, 0906 and I–78–01–0148, wherein he testified that between Friday, July 7, 1978, when he was initially reincarcerated, and Tuesday, July 11, 1978, he was physically attacked by fellow prison inmates no less than seven times on account of the newspaper article which had appeared on July 6. Apparently on July 11, 1978, plaintiff was transferred from the general prison population into the maximum security section for protective custody where he remained for the balance of his incarceration period.

Further evidence of bad faith attributable to the State may be found in a remark admittedly made by Deputy Attorney General Meuse to plaintiff to the effect that the only way plaintiff would ever get back the found money which he had delivered to the State Police would be "over my [Mr. Meuse's] dead body." See trial testimony for January 31, 1980 in *State v. Campbell,* Cr.A. Nos. I–78–03–0904, 0905, 0906 and I–78–01–0418. Mr. Meuse could not possibly have known whether plaintiff was or would become legally entitled to the found money at the time this comment was made, since that determination is the precise subject of the pending civil case.

The above incidents are by no means an exhaustive litany of the evidence which would support a jury finding that following his finding of the money, plaintiff has been harassed needlessly and sometimes maliciously by various State representatives. Moreover, the evidence would support the further inference that these actions were motivated by a desire to prevent or impede plaintiff from seeking recovery of the found money from defendant. Even if the Court found "good faith" to be a relevant inquiry under § 8307(c), under the circumstances surrounding this case it is unlikely that defendant's or the State's hands would appear to be appreciably cleaner than plaintiff's.

## IV.

Having delineated the law of the case, the Court must now examine the undisputed material facts to determine whether summary judgment in favor of either party should be granted. Since the question of the ultimate characterization to be given found money is clearly one of fact, it should be reserved for the jury unless the undisputed facts are so conclusive that the Court may pass on the character of the money as a matter of law. *See* 1 Am.Jur.2d *Abandoned, Lost, etc., Property* § 38.

Under the statute, the initial burden is on plaintiff, who does not have possession of the money, to show that he was the finder of the money, that the found money was delivered to and has been in the custody of the State Police for at least one year, and that the true owner has not been located or filed a valid claim for the money within that year. In the case at bar, defendant concedes that undisputed facts establish all of the foregoing elements.

The only material factual dispute between the parties concerns the ultimate characterization of the found money. The basic dispute is that defendant contends the money was "stolen" while plaintiff says it was not. Regarding the initial question as to who must shoulder the burden of proof on this issue, the Court concludes that defendant must show, by a preponderance of the evidence, that the money was stolen before the burden of rebuttal will shift to plaintiff. The Court's conclusion is based simply on the mathematical probability that absent any consideration of the facts in a particular case it is more likely that found money was not stolen than *vice versa*. Rather than make the finder thereof prove a negative fact, *i. e.*, that the money was not stolen, it is more logical and reasonable to require that defendant affirmatively prove the existence of the disputed fact. In other words, as between a finder and the State Police, § 8307(c) creates a rebuttable presumption that found money was not sto-

len.[15] *See* 1 Am.Jur.2d *Abandoned, Lost, etc., Property* § 36.

Looking to the facts in this case the Court is unable to conclude as a matter of law that the found money either was or was not stolen. Defendant cites the following facts as proof that the money was stolen:

1. money was found in a "thieves" junkyard;
2. money was found in a previously stolen safe;
3. other stolen property was in the same area, *e. g.*, stripped cars and other safes;
4. the bills were in relatively small denominations and were packaged in denominational order, *i. e.*, $5 bills together, $10 bills together, etc.;
5. the money was found late at night;
6. the failure of the depositor to attempt to claim the full amount of money from the State Police; and
7. the large amount of money in the package.

From this circumstantial evidence defendant insists that the only reasonable inference to be drawn is that the money was stolen. Alternatively, defendant argues that these facts are sufficient to raise a jury issue as to the proper characterization of the found money.

Plaintiff argues that the facts relied upon by defendant are insufficient to overcome his motion for summary judgment. He points to the additional fact that after a standard police computer check by serial number on all the bills only one $10 bill was shown to have been taken in a bank robbery in Philadelphia. Plaintiff also relies on the fact that although nearly one hundred persons made inquiries to the State Police concerning the money, the State Police have been unable to connect the money or any significant portion thereof to a particular theft. Plaintiff contends that these facts compel the conclusion that the found money was not stolen.

15. The Court notes that a contrary holding, *i. e.*, that the statute creates a presumption that found money was stolen, might well undermine the legislative purpose in enacting § 8307(c), for finders might be discouraged thereby from delivering found money to the State Police.

On a motion for summary judgment all facts must be viewed in a manner most favorable to the non-moving party, *Judah v. Delaware Trust Co.*, Del.Supr., 378 A.2d 624, 632 (1977), as well as all reasonable inferences which may be drawn from the undisputed facts. *Id.; Schagrin v. Wilmington Medical Center, Inc.*, Del.Super., 304 A.2d 61, 63 (1973). While the subsidiary facts upon which the parties herein rely are not disputed, the ultimate fact to be proved, *i. e.*, whether the found money was stolen, is hotly disputed and rests upon inference from the subsidiary facts. The case is a close one, but in the final analysis, at this preliminary stage of the proceedings, the Court is unable to conclude that the only reasonable inferences to be drawn from the undisputed facts conclusively favor plaintiff or defendant. Consequently, summary judgment to either party is inappropriate at this time.

Given the thoroughly unique nature of this case and the fact that it presents significant issues of first impression under § 8307(c), the Court also finds guidance from the admonition in *Ebersole v. Lowengrub*, Del.Supr., 180 A.2d 467, 470 (1962):

"Nor will summary judgment be granted if, upon an examination of all the facts, it seems desirable to inquire thoroughly into them in order to clarify the application of the law to the circumstances."

## V.

In conclusion and in accordance with the foregoing analysis, the Court has determined that summary judgment to either party should be, and hereby is, denied. The Court has also determined that the pending criminal motion for return of property should also be, and hereby is, denied.

IT IS SO ORDERED.