# In the
# United States Court of Appeals
## For the Seventh Circuit

————————

No. 03-1157

IN RE: THOMAS O. OAKLEY,

*Debtor-Appellee.*

APPEAL OF: DANIEL L. FREELAND,

*Trustee.*

————————

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 02 C 50—**Rudy Lozano**, *Judge.*

————————

ARGUED SEPTEMBER 5, 2003—DECIDED SEPTEMBER 25, 2003

————————

Before BAUER, POSNER, and ROVNER, *Circuit Judges.*

POSNER, *Circuit Judge.* The question presented by this appeal is whether U.S. currency is "tangible" or "intangible" personal property within the meaning of an Indiana statute that places some of the property of a bankrupt or other judgment debtor beyond the reach of his creditors. See *Arnold v. Melvin R. Hall, Inc.*, 496 N.E.2d 63, 65 (Ind. 1986); *State ex rel. Wilson v. Monroe Superior Court IV*, 444 N.E.2d 1178, 1178 (Ind. 1983); *In re Salzer*, 52 F.3d 708, 711 (7th Cir. 1995). The statute exempts $4000 worth of tangible property, but only $100 of intangible property, Ind. Code §§ 34-55-10-2(b)(2), (3), which is why it makes a difference how currency is classified. The statute is applicable to this bankruptcy case because the Bankruptcy Code allows a state to substitute its

own system of debtor exemptions for the Code's, 11 U.S.C. §§ 522(b)(1), (2)(A), and Indiana has taken up this option. Ind. Code § 34-55-10-1; *In re Salzer*, *supra*, 52 F.3d at 711 n. 2.

Thomas Oakley declared bankruptcy under Chapter 7 of the Bankruptcy Code and claimed an exemption of $2700 in cash, which was too much by $2600 if cash, like a bank account, corporate stock, Treasury note or other bond, or promissory note, is intangible property within the meaning of the Indiana statute. The only uncontroversially tangible property that Oakley sought to exempt consisted of household goods and furnishings ($500), necessary wearing apparel ($250), and a watch ($150), which add up to only $900, so it is understandable why he wanted his cash deemed tangible property. The trustee objected and his objection was sustained by the bankruptcy judge, but the district judge reversed. 287 B.R. 174 (N.D. Ind. 2002). The district judge's order was final and therefore (see 28 U.S.C. § 158(d)) appealable. *In re Erickson*, 815 F.2d 1090, 1091-92 (7th Cir. 1987); *In re Barker*, 768 F.2d 191, 194 (7th Cir. 1985); *In re White*, 727 F.2d 884, 886 (9th Cir. 1984); cf. *John T. Mather Memorial Hospital of Port Jefferson, Inc. v. Pearl,* 723 F.2d 193, 194 n. 1 (2d Cir. 1983). Although it didn't wind up the bankruptcy proceeding, it definitively adjudicated the debtor's entitlement to a definite amount of money. The adjudication is definitive because it cannot be affected by the resolution of any other issue in the proceeding, and therefore no purpose would be served by postponing the appeal to the proceeding's conclusion.

To our surprise, the question whether cash is intangible property for purposes of debtor exemption statutes has not been discussed in any reported appellate opinion that we can find. Plenty of cases, laboriously parsed in the parties' briefs, address the question whether cash is tangible or intangible property in other contexts, such as taxation or

probate, but none involves debtor exemptions. Those cases reach divergent results—for example, compare *Blodgett v. Silberman*, 277 U.S. 1, 18 (1928), with *In re Estate of Larson*, 538 N.W.2d 802 (Wis. App. 1995); see also *Losana Corp. v. Porterfield*, 236 N.E.2d 535, 537 (Ohio 1968)—but that is altogether natural. The correct classification depends on the legal consequences, which vary from statute to statute; but as a result the classifications that have been made  by cases interpreting other statutes do not illuminate, let alone - control, the issue in this case.

Oakley makes much of the fact that currency is tangible in the literal sense: it can be touched (also tasted, felt, sniffed, etc.), unlike a bank account. Although the amount of money in a person's bank account is evidenced by a piece of paper (if only a printout of a computer record— and anyway the electrons in a computer file are tangible in a conventional sense of the word), the money itself cannot be touched, tasted, etc. You cannot peek inside your bank account and see something any more that you can look under the hood of your car and see the torque or the horsepower. A bank account, a bond, a stock interest in a corporation, and other such financial assets do not have a physical or temporal site; they are to currency as an idea or a number is to a rock or an onion. They have, in short, a different ontology.

This is just a historical accident, though. Paper money used to consist of promissory notes issued by banks, the promise being to pay gold or silver. Such paper money, though tangible, is so in the same irrelevant sense in which any promissory note is tangible. Later, paper money consisted of promissory notes issued by government banks, such as the federal reserve banks, but it was still redeemable in specie (just as a winning lottery ticket is redeemable in money). Eventually they ceased to be redeemable, but why

that should affect a debtor's rights is beyond us. Still, for what (very little) it is worth, Oakley has literalism on his side—and he claims also to have liberalism on his side, arguing that exemptions from creditors' collection efforts are designed for the benefit of debtors and therefore should be construed in debtors' favor. We do not understand the "therefore." It is true that decisions in Indiana and elsewhere say such things as that debtor exemptions are "based upon considerations of public policy and humanity; and it was not alone for the benefit of the debtor, but for his family also, that such laws were enacted, and the same should be liberally construed." *Pomeroy v. Beach*, 49 N.E. 370, 372 (Ind. 1898); see also *In re Zimmermann*, 46 P.3d 599, 601 (Mont. 2002); *In re Portal*, 45 P.3d 891, 892 (N.M. 2002); *Goldenberg v. Sawczak*, 791 So. 2d 1078, 1081 (Fla. 2001). But if the exemption itself is pro-debtor, the ceiling on it is pro-creditor, as acknowledged in cases such as *In re Zumbrun*, 626 N.E.2d 452, 455 (Ind. 1993), where we read that "the various statutes adopted over the years fixing the dollar amount of exemptions represented a policy balancing the interests of lender and debtor." The deeper point is that, as we pointed out in *In re Thompson*, 867 F.2d 416, 419 (7th Cir. 1989), and *In re Szekely*, 936 F.2d 897, 901 (7th Cir. 1991); cf. *Cox v. Zale Delaware, Inc.*, 239 F.3d 910, 912-13 (7th Cir. 2001), generous-seeming exemptions from debt collection don't necessarily benefit debtors. The harder it is to collect a debt, the higher the interest rate that lenders will charge, with the result that debtors as a whole, as distinct from the subset of defaulting debtors, may actually be hurt by a "generous" scheme of exemptions.

The key to a sound interpretation of the words "tangible" and "intangible" in the Indiana debtor-exemptions statute lies in the legislature's purpose, so far as that can be inferred, in making the respective exemptions of such dif-

ferent size. Why would Indiana allow 40 times as great an exemption for tangible property as for intangible property? The answer probably is that Indiana doesn't want the creditor to be able to take away all the debtor's clothes, dishes, towels, toilet paper, appliances, work tools, and furniture, as that would make it almost impossible for him to function; $4000 is a very modest estimate of the amount of tangible property that a person needs to survive as a selfrespecting citizen rather than as a beggar or a derelict. Other exemptions, which work in the same direction, are $7500 for the debtor's personal residence, and, without limitation of value, "professionally prescribed health aids." Ind. Code §§ 34-55-10-2(b)(1), (4). It is significant that, unlike the Bankruptcy Code's menu of exemptions, Indiana does not separately exempt "implements, professional books, or tools, of the trade of the debtor." 11 U.S.C. § 522(d)(6). Exemption of them must be sought as part of the exemption for tangible property. This reinforces the inference that the tangible-property exemption is intended primarily for indispensables, although for obvious practical reasons it is not limited to them; "indispensability" would not be a workable criterion for determining how much property a debtor should be permitted to keep out of the hands of his creditors.

In contrast to tangible possessions, financial assets are in the nature of reserves. And creditors much prefer to levy on them because the cost of selling a debtor's personal possessions (the creditor isn't going to want to *wear* the debtor's clothes, after all) is likely to eat up the revenue from the sale; the essentially *in terrorem* purpose of authorizing creditors to threaten to seize and sell such property is well recognized. *In re Thompson*, *supra*, 867 F.2d at 418. Exempting mainly just tangible property is a win-win solution to the collection problem from the standpoint of both parties.

This we imagine explains the statute's steep tilt in favor of exempting the debtor's tangible rather than intangible goods.

Our analysis points to classifying cash as intangible property. From the standpoint of debtor and creditor alike, cash is interchangeable with other financial assets, and things that are interchangeable should normally be treated the same by the law in order to prevent evasion through easy substitution. If as Oakley argues $4000 in cash but not in a bank account is exempt, debtors in Indiana who face collection actions will be quick to convert their bank accounts to cash, a danger recognized by the Indiana Supreme Court in a related context in *In re Zumbrun, supra*, 626 N.E.2d at 455. They are less likely to convert cash to furniture or clothes that they don't need as much as they need the cash. (If they needed them more, they probably would have bought them already.) By the same token, creditors are happy to receive cash in lieu of a check—happier, in fact, since checks can bounce. Treating cash as a form of tangible property for purposes of the exemption statute would thus create perverse incentives for debtors while depriving creditors of access to a financial asset as easily liquidated as any of the financial assets conceded to be intangible property entitled to only the meager $100 exemption. Of course, the debtor cannot eat his exempt tangible property; and $100 does not go far. But its meagerness is somewhat deceptive, since Indiana permits creditors to garnish a maximum of 25 percent of a debtor's income—of his *disposable* income, which is only a fraction of his total income. Ind. Code § 24-4.5-5-105(2). See *Mims v. Commercial Credit Corp.*, 307 N.E.2d 867, 868 (Ind. 1974).

The distinction that we are emphasizing is between use value and exchange value. A napkin has value; you can wipe your mouth with it. Wallpaper has value; you can

decorate your walls with it. People do not wipe their mouths with money or paper their walls with it. They value cash only because they can use it to obtain useful goods like napkins and wallpaper. They value money in the bank for the identical reason. Oakley points out that if you lose your checkbook, your bank account is intact, but if you lose cash, it's gone. It may not be. If cash is stolen from your house, and you have burglary insurance, the insurance company will restore the money to you—but not in cash, instead by check, which you'll be happy to accept in lieu of cash. If what was stolen from you was a $100 bill, you could not complain if the insurance company wrote you a check for that amount, rather than giving you a $100 bill; or if it gave you five $20 bills instead of one $100 bill—which shows that the piece of rag paper, the tangible embodiment of cash money, is no more indispensable than the stolen checkbook or credit card. In contrast, if your chair were stolen, the insurance company might replace the chair or give you a check for its value, but the one thing it would not do would be to give you cash equal to the value of the check and tell you, sit on this.

There is an exotic analogy to the rule of the English common law that treasure trove escheats to the government rather than being the property of the finder. *Campbell v. Cochran*, 416 A.2d 211, 222 n. 10 (Del. Super. 1980). Treasure trove is any money, gold, or silver hidden underground; the rule's original reference was to buried Roman treasures discovered in feudal times. The Crown wanted the treasures for itself rather than let the finder keep them. *Corliss v. Wenner*, 34 P.3d 1100, 1104-05 (Idaho App. 2001); Jesse Dukeminier & James E. Krier, *Property* 112-13 (4th ed. 1998). How the British monarchy financed itself is irrelevant to this case, but a modern rationale can be suggested for the rule. We do not want to encourage people to search for buried

money, especially paper money, which has no utilitarian value (unlike gold or silver, which can be used to make jewelry and other useful items), because an increase in the amount of money in circulation does not increase the stock of useful goods; it merely reduces the exchange value of each unit of money. The discovery of gold by the Spanish in the New World caused inflation in Europe; it did not enrich Europe. Although money does not cease to be treasure trove merely because it becomes a collector's item, see, e.g., *Morgan v. Wiser*, 711 S.W.2d 220 (Tenn. App. 1985)—a coin recovered from a sunken galleon, for example, or a $20 bill in which Michael Jackson's face is substituted for Andrew Jackson's—at that point it no longer has merely exchange value. It has become a useful object, like a work of art, and so is treated as tangible property, *Sanders v. Freeman*, 221 F.3d 846, 855-56 (6th Cir. 2000); *Losana Corp. v. Porterfield*, *supra*, 236 N.E.2d at 537, though again we cannot find a pertinent debtor-exemption case.

We may seem to have wandered from the point, which was not the metaphysics of money but the practical economics of debt collection. But there is a connection. Because money in whatever form—whether cash or an invisible, a disembodied, financial asset—is a medium of exchange rather than a useful good (with the irrelevant exception of money that has become a collector's item), it is what creditors want to levy on. Clothes, furniture, and other personal possessions are useful goods that are indispensable (up to a point—but remember that the exemption for tangible property is modest) to the debtor but of little value to creditors, who would have to convert them to money to recover their loan and would incur heavy transaction costs, relative to the value of the goods, in the process.

So no more than $100 of Oakley's $2700 in U.S. currency was entitled to be exempted from the bankrupt estate; the

trustee is entitled to the rest. Even Oakley's entitlement to the $100 is uncertain. It depends on whether he has any other intangible property that he wants to exempt—and it happens that his schedule of exemptions includes $200 for a security deposit and $100 for a savings account. Both claims are to exempt intangible property, yet as far as we can determine the trustee objected to neither even though their sum exceeds $100. The matter can be straightened out in the bankruptcy court.

REVERSED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*