## Mary Morgan v. Zane Kroupa

[702 A.2d 630]

No. 95-594

Present: **Gibson, Dooley, Morse and Johnson, JJ., and Allen, C.J. (Ret.), Specially Assigned**

Opinion Filed September 5, 1997

*Beth Robinson* of *Langrock Sperry & Wool,* Middlebury, for Plaintiff-Appellee.

*Christena M. Obregon,* Burlington, for Defendant-Appellant.

**Morse, J.** Defendant Zane Kroupa appeals from a judgment awarding possession of a dog named Boy (a/k/a Max) to plaintiff Mary Morgan. We affirm.

Defendant adopted a mixed-breed puppy when it was six to eight weeks old and trained it to be a hunting dog. In July 1994, when the dog was five years old, it broke free of its collar, ran away and became lost. Defendant immediately informed his friends and local businesses, and notified the Addison County Humane Society of the dog's escape.

About two weeks later, plaintiff found the dog walking down Route 17 in the Town of Addison and brought it home. She called the Addison County Humane Society and gave a description of the dog; the Humane Society told her to keep the dog until she, or they, could find the owner. She apparently never heard back from them. Plaintiff also posted notices in three State Parks and four general stores in the area, and arranged to have a local radio station broadcast at least two announcements concerning the dog. Although defendant resided in Addison, a rural town of approximately 1,000 residents, he allegedly did not locate the dog for more than one year after it became lost.

Plaintiff took care of the dog and fed and sheltered it. She considered it the household pet. In September 1995, a friend of defendant's told him that he had seen the dog at a house only two miles down the road. Defendant drove to the house, which belonged to plaintiff's boyfriend, and sought unsuccessfully to have the dog returned. As defendant prepared to leave, however, the dog jumped in

his truck and defendant left with the animal. Shortly thereafter, plaintiff brought this action in replevin to recover the dog.

The trial court, sitting without a jury, ruled in favor of plaintiff and returned Max to her. In so holding, the court noted that the case could be analyzed under several different theories. The first was to treat the matter as a simple property case, applying the Vermont "lost property" statute, 27 V.S.A. §§ 1101-1110. The second was to analogize it to a child custody case, inquiring into what was in the "best interests" of the dog. The third was to base the judgment on the emotional "attachment" of the contending parties. The trial court essentially chose the first approach, ruling that plaintiff had "substantially compl[ied]" with the statute and was therefore entitled to possession.

Vermont's lost property statute provides that a person who

> finds money or goods, to the value of $3.00 or more, or takes up a stray beast, the owner of which is not known, shall, within six days thereafter, make two notices, describing such money, goods or beast, with the natural or artificial marks, with the time and place of finding or taking up the same, and post them in two public places in town in which such property was found.

27 V.S.A. § 1101. If the value of the property exceeds $10.00, the finder must additionally "immediately cause a copy of the notice to be published three weeks successively in some newspaper circulating in such town." 27 V.S.A. § 1103. If the owner does not appear and claim the property within twenty days of the notice, the finder must additionally "cause a copy of the notice to be recorded in the office of the clerk of such town." 27 V.S.A. § 1104. Should the owner not claim the property within ninety days, other provisions of the statute allow the finder to "sell it at public auction" and retain a portion of the proceeds to defray the "expenses of keeping the property," the balance to be "paid to the town treasurer," 27 V.S.A. § 1105, and to further "put such beast to reasonable labor . . . allow[ing] the owner a reasonable compensation therefor." 27 V.S.A. § 1109.

From its plain terms and judical application over time it is evident that the statute — which dates from the late-eighteenth and early-nineteenth centuries — was designed for agricultural animals of substantial monetary value, not lost pets. Although no direct legislative history is extant, the legislature undoubtedly intended the phrase "stray beasts" to include, as the trial court here observed, "animals

that had very significant value" such as cows, oxen, horses, sheep, swine and other farm animals that formed the basis of a largely agricultural economy. The specific and exacting notice requirements, provision for public *auction*, and the allowance for "put[ting] such beast[s] to reasonable *labor*" all presume, and seek to protect the owner's and finder's interest in, an animal of significant financial value. 27 V.S.A. § 1109.

■ Similar economic concerns inform 20 V.S.A. § 3411, which grants the right to "impound a beast" found in one's "enclosure." The impounder must give the owner prompt notice or post an advertisement if the owner is unknown, and, if the owner does not appear, the impounder may sell the beast at public auction. *Id.* §§ 3413, 3419, 3420, 3421. The purpose of the statute is to provide a "prompt and speedy" return or disposition of animals of considerable economic value. *Harriman v. Fifield*, 36 Vt. 341, 346 (1863).

This construction is amply supported by over 170 years of case law, during which time numerous reported decisions have construed and applied 20 V.S.A. § 3411 and 27 V.S.A. § 1110. These decisions have generally involved disputes between neighbors over stray or impounded farm animals. See, e.g., *Dunbar v. Godbout*, 105 Vt. 448, 168 A. 551 (1933) (cattle); *Andrews v. Carl*, 77 Vt. 172, 59 A. 167 (1904) (heifer calf); *Howard v. Bartlett*, 70 Vt. 314, 40 A. 825 (1898) (cattle); *Mattison v. Turner*, 70 Vt. 113, 39 A. 635 (1897) (cattle); *Chaffee v. Harrington*, 60 Vt. 718, 15 A. 350 (1888) (horse); *Bowman v. Brown*, 55 Vt. 184 (1882) (cow); *Dudley v. McKenzie*, 54 Vt. 394 (1882) (sheep); *Porter v. Aldrich*, 39 Vt. 326 (1866) (oxen); *Keith v. Bradford*, 39 Vt. 34 (1866) (cattle); *Boothe v. Fitzpatrick*, 36 Vt. 681 (1864) (bull); *Harriman*, 36 Vt. 341 (cows); *Riker v. Hooper*, 35 Vt. 457 (1862) (horse); *Edwards v. Osgood*, 33 Vt. 224 (1860) (bull); *Hooper v. Kittredge*, 16 Vt. 677 (1844) (horses); *Moore v. Robbins*, 7 Vt. 363 (1835) (sheep).

No decision has ever applied the lost-property or impounding statutes to any kind of "beast" other than a farm animal of considerable value. Since dogs have been mankind's companion throughout the ages, one could safely assume that if the statute applied to disputes over domestic pets some decision over the last two centuries would have said so. The case law thus strongly supports the inference that the statute was not designed to govern the present situation, involving a lost pet dog. A pet dog generally has no substantial market value as such; it generally cannot be "put . . . to . . . labor" or sold at "public auction" as contemplated by the statute. 27 V.S.A.

§§ 1105, 1109. Here, for example, we are dealing with a mixed-breed dog that was given away as a puppy and was five or six years old when it became lost. Like most pets, its worth is not primarily financial, but emotional; its value derives from the animal's *relationship* with its human companions. As the trial court here observed, "a dog like Max may have a lot of emotional value but there's nothing in the record to suggest that the dog has a fair market value of any significance."

Thus, modern courts have recognized that pets generally do not fit neatly within traditional property law principles. "[A] pet is not just a thing but occupies a special place somewhere in between a person and a piece of personal property." *Corso v. Crawford Dog & Cat Hosp., Inc.*, 415 N.Y.S.2d 182, 183 (Civ. Ct. 1979). Ordinary common law or statutory rules governing lost personal property therefore do not provide a useful framework for resolving disputes over lost pets. Instead, courts must fashion and apply rules that recognize their unique status, and protect the interests of both owner and finder, as well as the public. In this regard, the trial court was correct that family law provides an imperfect analogue. However strong the emotional attachments between pets and humans, courts simply cannot evaluate the "best interests" of an animal. Recognizing, however, the substantial value that society places on domestic animals, it is proper that the law encourage finders to take in and care for lost pets. A stray dog obviously requires care and shelter, and left unattended could pose hazards to traffic, spread rabies, or exacerbate an animal overpopulation problem if unneutered. A rule of decision that made it difficult or impossible for the finder to keep the animal after many months or years of care and companionship might deter these salutary efforts, and would not be in the public interest.

The value of a pet to its human companions has already been noted. Accordingly, apart from providing care and shelter, finders of stray pets should also be encouraged to make every reasonable effort to find the animal's owner. Although circumstances will vary, this might include contacting the local humane society, veterinarians, or the police department, posting notices near where the animal was found, and placing newspaper or radio advertisements. Additionally, owners of lost pets should be enjoined to undertake reasonable efforts to locate their animals by contacting local humane societies and other appropriate agencies, printing and placing notices, or taking out appropriate advertisements. Together these requirements provide an incentive to finders to care for stray pets and attempt to locate their

owners, and place the onus on owners to conscientiously search for their pet.

When confronted with a case of this nature, therefore, courts should factor these practical and policy considerations into · any decision. Indeed, this was essentially the approach taken by the trial court here. Although couched in terms of "substantial compliance" with the lost-property statute, the court basically held that where the finder of a lost pet makes a reasonable effort to locate its owner, and responsibly cares for the animal over a reasonably extensive period of time, the finder may acquire possession of the animal. As the court explained, "The court's going to decide this case on the basis that [plaintiff] found a stray dog, cared for it for a year, [and] did put up notice when she found it . . . . [I]f you pick up a stray which does not have a market value to speak of, if you have put up notices . . . . I think that's what the law requires and after a passage of time you're entitled to keep the dog."

■■ Having found that plaintiff diligently attempted to locate the dog's owner and responsibly sheltered and cared for the animal for over a year, the trial court was clearly within its discretion in awarding possession to plaintiff. We will not set aside findings made by a trial court unless clearly erroneous, nor disturb its conclusions if they are supported by its findings. *Cameron v. Double A. Services, Inc.*, 156 Vt. 577, 581-82, 595 A.2d 259, 261-62 (1991).

Defendant raises two claims of error, neither of which is persuasive. First, he contends the trial court erred in ruling that plaintiff had substantially complied with the notice provisions of the lost-property statute. Having concluded that the statute does not apply in these circumstances, we find the argument to be wide of the mark.

Second, he claims a right to possession under the property law principles of trover and conversion. See *Economou v. Carpenter*, 124 Vt. 451, 453-54, 207 A.2d 241, 243 (1965) ("'[I]n the sense of the law of trover, a conversion consists either in the appropriation of the property to the party's own use and beneficial enjoyment, or in its destruction, or in exercising dominion over it in exclusion and defiance of the owner's right, or in withholding possession from the owner under a claim of title inconsistent with his title.'") (quoting *C.H. Eddy & Co. v. Field*, 85 Vt. 188, 189, 81 A. 249, 250 (1911)). As discussed earlier, however, "property" in domestic pets is of a highly qualified nature, possession of which may be subject to limitation and control. For example, 20 V.S.A. § 3511 provides that an animal shall be "deemed to be abandoned" if placed in the custody of a veterinarian or kennel and not removed at the end of the agreed time period.

Animals in the possession of an incorporated humane society may be disposed of by any method it deems appropriate. 20 V.S.A. § 3909. Domestic pets suspected of having been exposed to rabies may be confined or impounded, 20 V.S.A. § 3806, and "vicious" domestic pets may be removed from the owner and "disposed of in a humane way." 20 V.S.A. § 3546(c).

Thus, possession of domestic pets may be, and often is, limited by overriding public interests. In this case, as explained above, the public interest in encouraging finders to care for and shelter lost pets necessarily qualifies the owner's right to possession. Where, as here, the finder of a lost domestic animal diligently attempts to locate its owner and provides care, shelter and companionship to the animal for over a year, a trial court does not abuse its discretion in awarding possession to the finder.

The dissent raises two concerns. First, it challenges the exclusion of lost pets from the lost-property statute because of the supposed difficulty in distinguishing "between animals kept for economic reasons and those kept as pets." 167 Vt. at 107, 702 A.2d at 636. The Court's opinion draws no such distinction. As noted, the statute expressly applies to animals that can be put to "labor" and sold at "auction," i.e., agricultural animals with substantial economic value. The fact that a horse may also be considered to be a pet does not remove it from this category. A pet dog, cat or hamster generally does not fall within this class. There may be the rare exception, such as a working sheep dog, which could fall within the statute, but the exception only proves the rule.

The dissent's second concern is that the Court's opinion will somehow encourage a black market in stolen pets. The requirements that a finder make reasonable and diligent efforts to locate the owner — in this case by posting notices, placing newspaper advertisments, contacting the humane society, and arranging for radio announcements — precludes the unscrupulous from asserting rights in a stolen pet. The dissent's argument suggests that someone would conspire to: (1) steal a pet, (2) diligently proceed to contact the police, the humane society, and local newspaper and radio stations, all with the hope that the owner will somehow overlook these efforts, and finally, (3) retain the pet for a year or more, all with the ulterior purpose of ultimately selling the animal. Black marketeers do not, however, publicize their stolen wares, nor do they retain them for long periods. Nothing in the Court's opinion, in short, will provide the slightest advantage to such scoundrels.

*Affirmed.*

**Gibson, J.,** dissenting. Because I believe that Vermont's lost-property statute, 27 V.S.A. §§ 1101-1110, rejected by the Court herein, outlines the rights and responsibilities of both true owners and finders of stray domesticated animals, including dogs, and that, under the provisions of that statute, Boy (a/k/a Max) should be returned to defendant, I respectfully dissent.

The Court does not appear to dispute the long-settled, common-law rule that a finder of lost personal property has title that is superior to all but the true owner, see *Campbell v. Cochran*, 416 A.2d 211, 221 (Del. Super. Ct. 1980); that Vermont's lost-property statute reflects this common-law principle; or that the statute governs ownership and compensation rights in disputes over stray domesticated animals such as livestock. Instead, the Court asserts that the statute's application to "stray beasts" does not include pet dogs.

We have not previously needed to decide whether a dog is a "beast" under our lost property and impounding statutes.[1] See *Vosburgh v. Kimball*, 130 Vt. 27, 30, 285 A.2d 766, 768 (1971). There is no indication, however, that the Legislature intended to exclude certain species of domesticated animals. Nor is there any logical reason to separate dogs from other domesticated animals, see *Mungo v. Bennett*, 119 S.E.2d 522, 523 (S.C. 1961) (grouping horses, mules, cattle, dogs, and cats), all of which are legally classified as personal property. See *Richardson v. Fairbanks North Star Borough*, 705 P.2d 454, 456 (Alaska 1985) (dogs have legal status as personal property); *State v. M'Duffie*, 34 N.H. 523, 526 (1857) ("Dogs are . . . as much the subject of property or ownership, as horses, cattle or sheep."); accord *Thiele v. City of Denver*, 312 P.2d 786, 789 (Colo. 1957); *Levine v. Knowles*, 197 So. 2d 329, 331 (Fla. Dist. Ct. App. 1967); *Smith v. Costello*, 290 P.2d 742, 743 (Idaho 1955); *Jankoski v. Preiser Animal Hosp. Ltd.*, 510 N.E.2d 1084, 1086 (Ill. App. Ct. 1987); cf. *Conti v. ASPCA*, 353 N.Y.S.2d 288 (Civ. Ct. 1974) (where finder of escaped pet parrot refused to return bird to owner, court found parrot was domesticated and ordered return to owner under common-law rule of lost property). Further, the dictionary defines "beast" as "an animal

---

[1] Vermont's impounding law also applies to "beasts" and allows a person to impound any "beast" found on his land doing damage. 20 V.S.A. § 3411. Like the lost-property statute, where the true owner is unknown, the impounder must post notice. *Id.* § 3420. The impounder may sell the animal if the owner fails to appear within thirty days and claim it, but must return it when the owner appears and compensates the impounder for the damage and for the expense of keeping and advertising the animal. *Id.* § 3421.

as distinguished from a plant," and "a lower animal as distinguished from man," Webster's New Collegiate Dictionary 96 (1981), making no distinction between dogs and other animals.

In this case, the Court follows neither the lost-property statute nor the generally accepted common-law rule. Instead, without benefit of citation to any supporting authority, the Court fashions its own solution in a manner that will be difficult, if not impossible, to apply in a consistent manner in future cases. The Court asserts that the statute applies only to animals having "significant value."[2] 167 Vt. at 101, 102, 702 A.2d at 632, 633. Exclusion of dogs from the lost-property statute based on lack of market value is indefensible, however. The statute deals solely with rights of ownership and compensation for expenses. The statute's notice provisions apply to *any* stray animal regardless of value, while a finder of goods or money must post notices only if the value is $3 or more, 27 V.S.A. § 1101; if the value of found property exceeds $10, additional newspaper notice is required. *Id.* § 1103. Thus the issue of value arises only in determining the type of notice a finder must give.

To the extent that the financial value of pets, as opposed to livestock, is relevant, other jurisdictions have acknowledged in different settings that pet dogs do have value beyond that reflected by a pure market-value analysis and have adopted means to measure that value. See *Levine*, 197 So. 2d at 331-32 (owner of pet Chihuahua could recover compensatory damages for intrinsic value and perhaps punitive damages); *Jankoski*, 510 N.E.2d at 1087 (actual value of pet dog could include sentimental value); *Fredeen v. Stride*, 525 P.2d 166, 168 (Or. 1974) (jury could consider mental distress as element of damages for loss of pet dog under certain circumstances); see generally P. Barton & F. Hill, *How Much Will You Receive in Damages From the Negligent or Intentional Killing of Your Pet Dog or Cat?*, 34 N.Y.L. Sch. L. Rev. 411 (1989). Thus, a pet dog of even mixed breeding could have significant financial value, and the Court's distinction on the basis of financial value is unjustified.

Further, a clear line cannot always be drawn between animals kept for economic reasons and those kept as pets. Many people who keep

---

[2] The Court also supports its holding with the assertion that pet dogs are not sold at auction. 167 Vt. at 102, 702 A.2d at 632, 633. In fact, however, it is not uncommon for dogs and cats to be sold at auction to research facilities. See 7 U.S.C. § 2137 ("It shall be unlawful for any research facility to purchase any dog or cat from any person *except an operator of an auction sale* subject to section 2142 of this title or a person holding a valid license as a dealer or exhibitor . . . .") (emphasis added); see also 27 V.S.A. § 1105 (providing for sale of unclaimed property at public auction).

livestock become emotionally attached to individual animals. Conversely, dogs may be owned primarily or solely for their economic value as work dogs or breeding stock. And there are animals that fall somewhere in between, such as pleasure horses — livestock that are not kept for their economic value, but are, in effect, large pets. To separate some species of domesticated animals from others on an attempted livestock-pet dichotomy is a purely arbitrary interpretation of the statute.

Although the Court believes its holding will encourage finders of lost animals to take them in and give them a home, I am concerned about the consequences of removing pets from the animal-theft protections of the lost-property statute. The lost-property statute was designed in part to remove incentives for animal theft and make it difficult for the finder to profit from selling a stray animal. See 27 V.S.A. § 1105 (if finder sells unwanted stray animal, proceeds of sale go to town after reimbursing finder for expenses). The Court, however, holds that any person who "finds" a dog and makes a "reasonable" effort to locate the owner may claim title to the animal superior to that of the true owner after an undefined "reasonable" amount of time.

Despite the Court's professions to the contrary, I cannot agree that plaintiff made a "reasonable effort" or "diligently attempted" to locate the dog's owner. 167 Vt. at 103, 104, 702 A.2d at 633. Although she posted notices, they simply read "lost dog" and listed a phone number, without describing the dog's breed, sex, approximate age (puppy or adult), color, markings or distinctive features, or whether the dog had a collar. While plaintiff also requested community-service radio ads, these ran for two days only, and there is no indication they were any more detailed than her posted notices. Thus, plaintiff failed to provide even the minimal notice necessary to qualify as "reasonable," much less comply with the lost-property statute. See *Chaffee v. Harrington*, 60 Vt. 718, 720-21, 15 A. 350, 351 (1888) (requirements of statute relating to rights and duties of finder of stray beast must be strictly complied with; plain purpose of statute in requiring that animal be described by natural or artificial marks is that owner and others who see ads may be able to recognize or identify animal).

An unfortunate consequence of the Court's opinion will be to give those who operate the nation's black market in stolen pets an easier means to gain title and profit from pets that are not their own. The history of attempts to curb the trade in stolen pets demonstrates the seriousness of the problem. Due in large part to the pervasiveness of

pet theft, Congress enacted the Animal Welfare Act (AWA) in 1966. 7 U.S.C. § 2131 (1988) (purpose includes "protect[ing] the owners of animals from the theft of their animals"); R. Masonis, *The Improved Standards for Laboratory Animals Act and the Proposed Regulations: A Glimmer of Hope in the Battle Against Abusive Animal Research*, 16 B.C. Envtl. Aff. L. Rev. 149, 153 (1988) (statute prompted by need to curb illicit trade of stolen household pets). The law requires licensing and record keeping for all dealers and research facilities using live dogs and cats. 7 U.S.C. §§ 2133, 2134, 2136, 2140 (1988).

In 1987 the United States Department of Agriculture noted that there was still evidence of "buying and selling obviously stolen animals and of a few research facilities obtaining animals under questionable circumstances," observing that the net effect of certain activities was to "encourage animal theft for profit." 61 Fed. Reg. 10,298, 10,305, 10,307 (1987). Enforcement in the past was lax, with only three criminal prosecutions and 122 administrative prosecutions against AWA violators from 1968 to 1980. Masonis, *supra*, at 156-57. In response, the statute was amended in 1990, see 7 U.S.C. §§ 2158-2159 (Supp. 1990), to further discourage the theft and sale of pets and allow, where possible, stolen pets to be reunited with their owners. N. Wilks, *The Pet Theft Act: Congressional Intent Plowed Under by the United States Department of Agriculture*, 1 Animal L. 103, 103 (1995). Nonetheless, criticism for failure to enforce the act continues. *Id.* at 122-24.

The Vermont Legislature acknowledged the problem of pet theft in 1968 when it also criminalized the theft of domesticated animals.[3] 1967, No. 365 (Adj. Sess.), § 7 (now codified, as amended, at 13 V.S.A. § 361(a)). It is difficult, however, to prove criminal intent when dogs in particular are known to be able to escape from fenced yards or from tethers and willingly respond to offers of food or attention from strangers. Thus, owners seeking to recover their lost pets will often look to the civil law for a remedy. Today's decision largely closes that avenue of relief.

---

[3] A person commits the crime of interference with domestic animals if he "confines or secretes a domestic animal owned by another, with the intention of concealing its identity or the identity of its owner" or if he conceals "the fact that the animal is licensed by removing the collar, harness or identification . . . from any . . . domestic animal owned by another." 13 V.S.A. § 361(a) (original version at 13 V.S.A. § 482). The crime is punishable by imprisonment for up to one year or a fine up to $2,000, or both. *Id.* § 361(b).

Because the statute provides a clear, consistent, and just approach to settling disputes between finders and owners of stray domesticated animals, and because it includes safeguards to protect pet owners from theft, I respectfully dissent. I am authorized to say that Chief Justice Allen joins in this dissent.