2004 VT 33

### Suzanne and Elizabeth Hegarty v. Addison County Humane Society

[848 A.2d 1139]

No. 02-385

Present: Amestoy, C.J., Johnson and Skoglund, JJ., and Allen, C.J. (Ret.) and Gibson, J. (Ret.), Specially Assigned

Opinion Filed April 2, 2004

*Peter F. Langrock* of *Langrock Sperry & Wool, LLP*, Middlebury, for Plaintiffs-Appellants.

*Jeff W. Lively*, Stowe, for Defendant-Appellee.

*William H. Sorrell*, Attorney General, Montpelier, and *Diane E. Zamos*, Assistant Attorney General, Waterbury, for Amicus Curiae.

¶ 1. **Skoglund, J.** On suspicion of inadequate care, defendant Addison County Humane Society (ACHS) seized Suzanne and Elizabeth Hegarty's elderly mare, Paka. The Hegartys sued ACHS in Addison Superior Court alleging claims for conversion and intentional infliction of emotional distress. The superior court granted ACHS's motion for summary judgment and the Hegartys appealed. Because ACHS followed the constitutionally sound procedures outlined in Vermont's animal cruelty statutes, we affirm.

¶ 2. After receiving complaints from neighbors, ACHS's humane officer Paul Meacham began to investigate Paka's health and the adequacy of her care. On several occasions in late July 2000, Meacham went by the Hegartys' pasture to assess the horse's condition. Seeing no apparent signs that Paka was receiving food or water, on August 16, 2000, Meacham contacted the Hegartys to discuss the issue. Meacham conveyed his concerns about Paka's health to Suzanne Hegarty and suggested corrective actions. Suzanne Hegarty responded that she adequately fed and provided for her horses and that they received

veterinary care. Meacham told Suzanne Hegarty that he would be sending a veterinarian to check Paka. She advised Meacham not to return to her property.

¶ 3. Later that day, Meacham called the ACHS veterinarian Dr. Hunt and asked him to go to the Hegartys' property and assess Paka's health. The next day, Dr. Hunt sent ACHS a report stating that, in his opinion, Paka was in an emaciated condition and was either sick, had poor teeth, or was receiving an inadequate diet. Meacham then contacted State's Attorney John Quinn to discuss the case and Paka's potential removal. Attorney Quinn advised ACHS to move forward using the procedure outlined in Vermont's animal cruelty statutes.

¶ 4. On August 18, 2000, Meacham went to the Hegartys' home and seized Paka. The horse received immediate veterinary care and treatment while in ACHS's custody. Attorney Quinn later advised ACHS to return Paka to the Hegartys. Paka was returned on approximately August 30, 2000, twelve days after the horse was seized.

¶ 5. That same day the Hegartys filed a complaint in Addison Superior Court alleging that ACHS unlawfully removed their "geriatric mare" and asserting claims for conversion and intentional infliction of emotional distress. After initial discovery, ACHS moved for summary judgment on grounds that it was authorized to seize Paka pursuant to Vermont's animal cruelty statutes, 13 V.S.A. §§ 351-354. The Hegartys opposed the motion, arguing that the material facts supported their conversion claim and that the pertinent portions of the animal cruelty statutes were unconstitutional under both the federal and state constitutions.

¶ 6. The trial court granted ACHS's summary judgment motion on grounds that because ACHS had "a good faith belief that the horse was in distress," the seizure was lawful. The court also held that the Hegartys' property right in "twelve days' possession of an old, blind, sick horse" was de minimis and thus did not trigger due process protection. The Hegartys appealed.[1]

¶ 7. On appeal, the Hegartys contest the trial court's denial of their conversion claim on two grounds. First, they assert that the trial court erred when it relied on *Morgan v. Kroupa* to characterize Paka as a pet and thus not subject to a conversion claim. 167 Vt. 99, 103-05, 702 A.2d 630, 633-34 (1997). We agree.

---

[1] We do not address the Hegartys' claim for intentional infliction of emotional distress because it was not raised on appeal.

■ ¶ 8. The trial court correctly cited *Morgan* for the proposition that, in the context of a conversion claim, the property interest in pets is of such a highly qualified nature that it may be limited by overriding public interests. *Id.* at 105, 702 A.2d at 634. We do not quarrel with this analysis, but rather with the court's suggestion that our *Morgan* ruling supports characterizing Paka as a pet. In *Morgan*, we explicitly distinguished between pets — dogs, cats, and hamsters — and "agricultural animals with substantial economic value." *Id.* The fact that a horse may also be considered a pet by its owner does not remove it from the category of agricultural animal with respect to the property interests at issue in a conversion claim. *Id.* Paka is not a pet, and the trial court's ruling to the contrary was in error.

■ ¶ 9. Second, the Hegartys insist that the trial court erred because the material facts support their conversion claim. A conversion is either the unlawful "appropriation of the property to the party's own use and beneficial enjoyment, . . . or in exercising dominion over it in exclusion and defiance of the owner's right, or in withholding possession from the owner under a claim of title inconsistent with his title." *Economou v. Carpenter*, 124 Vt. 451, 453-54, 207 A.2d 241, 243 (1965) (internal citations omitted). The Hegartys argue that when ACHS seized Paka it unlawfully withheld possession of their property in exclusion and defiance of their right and the court should have found a conversion as a matter of law. There is no dispute that the Hegartys are Paka's rightful owners or that, by seizing the horse, ACHS was withholding possession of Paka from them. The question is whether that deprivation was lawful.

¶ 10. ACHS insists that it acted under the authority granted by 13 V.S.A. § 354(b)(3) when it seized Paka without a warrant. Section 354(b)(3) states that if a humane officer witnesses a situation in which immediate action is required to protect an animal's health and safety, the officer may seize the animal without a warrant.[2] The trial court found that Meacham had a good faith belief that Paka was in imminent danger and thus was authorized to conduct a warrantless seizure.

---

[2] The specific text of 13 V.S.A. § 354(b)(3) provides:

> **Seizure without a search warrant.** If the humane officer witnesses a situation in which the humane officer determines that an animal's life is in jeopardy and immediate action is required to protect the animal's health or safety, the officer may seize the animal without a warrant. The humane officer shall immediately take an animal seized under this subdivision to a licensed veterinarian for medical attention to stabilize the animal's condition and to assess the health of the animal.

¶ 11. The uncontroverted facts evidence the following. Meacham made numerous trips to Paka's pasture to evaluate her health and care and observed what he determined was inadequate compliance with feeding and shelter requirements. He then contacted the Hegartys to discuss rectifying the problem. They denied there was a problem and advised Meacham not to return to their property. Meacham then went beyond the statutory requirements and employed a licensed veterinarian to assess the horse's health. Once the veterinarian confirmed Paka's deteriorating condition, Meacham went even one step further and contacted the state's attorney to discuss his authority to seize the animal. He then seized the animal and immediately took Paka to a licensed veterinarian for treatment. Finally, ACHS returned the animal to the Hegartys as soon as the state's attorney told ACHS to do so.

¶ 12. The statute explicitly empowers ACHS to seize an animal when the humane officer determines it is necessary to protect its health or safety. The undisputed facts indicate that Meacham reasonably believed that Paka's health was in jeopardy and that immediate action was required to protect her. In doing so, Meacham followed the statutory procedures during and after the seizure. ACHS lawfully seized Paka and thus cannot be held liable for conversion. We agree with the Hegartys that humane officers should, whenever possible, obtain a warrant prior to seizing an animal, but, when the circumstances demand it and the statutory procedures are followed, humane officers have the authority to seize animals without a warrant.

¶ 13. The Hegartys next assert a facial challenge to 13 V.S.A. § 354(b)(3)'s authorization of warrantless searches arguing that it is per se unconstitutional. Relying on *Lesher v. Reed*, 12 F.3d 148, 150-51 (8th Cir. 1994), they insist that the statute's failure to require a warrant makes the seizure unreasonable and thus a violation of their rights under both the federal and state constitutions.[3] A warrantless seizure is per se unreasonable unless justified by a few delineated

---

[3] The Hegartys asserted two state constitutional claims. Beyond quoting specific provisions, they failed to provide any substantive analysis or authority to support or address how their rights under the Vermont Constitution might differ from those under the U.S. Constitution. "It is not the proper role of this Court to act as an advocate for either of the parties ... [and] we will not construct an appellate case for either party out of whole cloth." *State v. Taylor*, 145 Vt. 437, 439, 491 A.2d 1034, 1035 (1985). These claims were inadequately briefed and we decline to address them.

exceptions to the warrant requirement. *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971); *Lesher*, 12 F.3d at 151. Exigent circumstances are a well-established exception to the warrant requirement, *Coolidge*, 403 U.S. at 454-55, even in cases involving the seizure of animals. *Siebert v. Severino*, 256 F.3d 648, 657 (7th Cir. 2001) ("Exigent circumstances may justify a warrantless seizure of animals."). Section 354(b)(3) permits warrantless seizures only when the facts present exigent circumstances; not until a humane officer witnesses a situation in which he determines that immediate action is required to protect the animal's health and safety may he engage in a warrantless seizure. Of course, each case should be evaluated individually and the determination of exigency must be closely examined, but we cannot agree that § 354(b)(3) is unconstitutional simply because it permits warrantless seizures.

¶ 14. The Hegartys next assert that § 354(b)(3) violates their constitutional right to due process by permitting ACHS to seize their horse without a meaningful opportunity to be heard prior to the seizure. The trial court concluded that "the property right in question — twelve days' possession of an old, blind, sick horse — is too insubstantial to trigger the Due Process clause." Finding their property interest de minimis, the court ruled that the Hegartys' due process claim failed as a matter of law.

¶ 15. To evaluate their due process claim, we must first determine whether the Hegartys were deprived of a constitutionally protected interest in life, liberty, or property. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982). Due process protections "apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of . . . property," the range of which is not infinite. *Board of Regents v. Roth*, 408 U.S. 564, 569-70 (1972). "[W]e must look not to the 'weight' but to the nature of the interest at stake," and the Court has "made clear that the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money." *Id.* at 571-72 (emphasis in original omitted). Property interests do not arise out of the Constitution, but "[r]ather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ." *Id.* at 577.

■ ¶ 16. The notion that the Hegartys' property interest in their horse is a constitutionally protected one follows logically from statutes and our prior case law in which we have consistently included horses in the group of agricultural animals or livestock routinely treated as

personal property. See 9 V.S.A. § 2481(6) (in chapter governing agricultural finance leases, "leased property" and "property" are defined as "personal property ... including goods, livestock, equipment and machinery" among other things); 13 V.S.A. § 351(11) (defining livestock as including horses); *Howard v. Howard*, 122 Vt. 27, 30, 163 A.2d 861, 864 (1960) (in a paternity and contract action, the Court included horses and cattle in list of personal property considered sufficient consideration in the settlement agreement at issue); *Swanton Savings Bank & Trust Co. v. Tremblay*, 113 Vt. 530, 535-36, 37 A.2d 381, 382-84 (1944) (in ruling on conversion of mortgaged chattels in foreclosure process, Court treated horses and cattle as personal property); *Pond v. Baker*, 58 Vt. 293, 299-302, 2 A. 164, 166 (1885) (including horses in list of livestock and other property attached to satisfy debt). When we examine the nature of the interest at stake in the context of our state law, it is evident that horses, be they thoroughbred studs or geriatric mares, are treated as valuable and constitutionally protected personal property. Furthermore, "[y]ou don't throw a whole life away just [be]cause it's banged up a little." Gary Ross, Seabiscuit: The Screenplay 61 (Ballantine Books 2003). We cannot agree therefore that twelve days' possession of an elderly horse is de minimis. The Hegartys' property interest in Paka was significant enough to trigger due process protection, and the trial court's ruling to the contrary was erroneous as a matter of law.

¶ 17. Even though we find that the Hegartys' property interest in Paka was constitutionally protected, we uphold the trial court's ruling that the Hegartys were not denied due process because under these circumstances the degree of their deprivation was not serious, the procedures underlying the deprivation adequately address the potential for errors, and they could have requested a post-deprivation hearing under V.R.Cr.P. 41(e).

¶ 18. "[D]ue process concerns arise whenever the state deprives an individual of an interest in the use of real or personal property." *Town of Randolph v. Estate of White*, 166 Vt. 280, 285, 693 A.2d 694, 697 (1997).[4] Once such a deprivation is established, we must determine

---

[4] The Hegartys failed to argue that Meacham was a state actor when he seized Paka. Under ordinary circumstances, their failure to make such a fundamental showing would be fatal to their due process claim. Since we affirm the trial court's decision on different grounds, however, we assume without deciding that, in this case, ACHS's humane officer

what process the complainant is due. *Logan*, 455 U.S. at 428. The presumption is that an individual is entitled to notice and an opportunity to be heard prior to deprivation of a property interest. See *id.* at 433-34. A predeprivation hearing is not required in all cases however. A post-deprivation hearing will satisfy due process when the circumstances necessitate quick action, see *id.* at 436, the length and severity of the deprivation is not serious, and the procedures underlying the decision to effect the deprivation sufficiently minimize the risk of an erroneous deprivation. See *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 19 (1978); *Mathews v. Eldridge*, 424 U.S. 319, 339-49 (1976).

¶ 19. Each of these factors leads us to conclude that the Hegartys were not denied due process. As examined above, 13 V.S.A. § 354(b)(3) permits a warrantless seizure only when exigent circumstances require quick action. In this case, Meacham investigated Paka's health and confirmed his suspicions of inadequate care with a licensed veterinarian. When the Hegartys refused to cooperate to improve Paka's care, Meacham was forced to act quickly to prevent further suspected mistreatment.

¶ 20. Finally, the procedures underlying the decision to seize the horse are sufficiently reliable to minimize the risk of error. The statute is a narrow one which permits warrantless seizures only in the unusual situations where the humane officer makes a reasonable determination that an animal's life is in jeopardy and immediate action is required. But, this statute must be viewed in the larger context of the criminal rules and procedures operable in criminal cases like this one. V.R.Cr.P. 41(e) provides a remedy for alleged victims of unlawful warrantless seizures of property.[5] Paka was seized as part of a criminal investigation into suspected animal cruelty and, as such, the Hegartys could have requested a V.R.Cr.P. 41(e) hearing to contest the warrantless

---

Meacham was acting as a state actor when he seized Paka pursuant to 13 V.S.A. § 354(b)(3).

[5] V.R.Cr.P. 41(e) provides:

> A person aggrieved by an unlawful search and seizure may move the court to which the warrant was returned or the court in the county or territorial unit where property has been seized without warrant for the return of the property on the ground that he is entitled to lawful possession of the property which was illegally seized. The judge shall receive evidence on any issue of fact necessary to the decision of the motion. If the motion is granted the property shall be restored and it shall not be admissible in evidence at any hearing or trial. After an indictment or information is filed, a motion for return of property shall be made or heard only in the county or territorial unit of trial and shall be treated as a motion to suppress under Rule 12(b)(3).

seizure and to obtain a judicial determination of whether they were entitled to possession of the horse pending the conclusion of the prosecutorial process. See V.R.Cr.P. 41(e). This remedy was available to the Hegartys at any time during the twelve-day criminal investigation, and the fact that no criminal charges were filed did not preclude them from filing a Rule 41(e) motion and thereby obtaining the due process they insist they were denied. See *State v. Kornell*, 169 Vt. 637, 638, 741 A.2d 290, 291 (1999) (mem.) (holding that Rule 41(e) motion for return of seized property is treated as a civil equitable proceeding when criminal proceedings against moving party are not yet pending).

¶ 21. Here, where the circumstances required quick action, the deprivation was neither lengthy nor severe, and sufficient safeguards existed to address the risk of erroneous deprivation, we find that the post-deprivation hearing available under Rule 41(e) was constitutionally adequate.

*Affirmed.*